INTERNATIONAL & GREAT NORTHERN RAILWAY COMPANY v. FRANK REIDEN.

Decided January 8, 1908.

**1.—Railroads—Personal Injuries—Contributory Negligence.**

In a suit by a brakeman against a railroad company for personal injuries alleged to have been caused by stepping upon a rotten cross-tie in the track

at a siding while he was attempting to flag an approaching train, and by the crumbling of the tie he was caused to fall and strike his head upon the rail, whereby he became unconscious, and while in that position and condition the engine he was trying to flag struck and injured him, evidence considered, and held to show no negligence on the part of the defendant company, and to show affirmatively that the plaintiff was guilty of contributory negligence.

### 2.—Master and Servant—Safe Place to Work.

A master is not liable where the servant's injury was not caused by any defect in the place in which he is required to work, which affected its safety when used in the ordinary way and for the purpose for which it was intended.

### 3.—Same—Safe Track.

The rule which requires a railroad company to keep its track in reasonably safe condition was intended for the protection of its servants while operating trains thereon, and if the master performs his duty in this respect he is not liable for an injury to a servant received while using the track for a different purpose, except in such places as the duties of the servant require him to walk upon, over or along the track.

### 4.—Negligence—Foreseen Consequences.

Negligence, to be actionable, must be the proximate cause of an injury which, in the light of the attending circumstances, ought to have been foreseen as a natural and probable consequence of the negligent act.

### 5.—Master and Servant—Disobedience of Rule.

A master has a right to rely upon his servants obeying the rules ordained for the safe conduct of his business, and to assume that when an occasion arises which calls for an observance of the rule, it will be obeyed.

Appeal from the 45th District Court, Bexar County.   Tried below before Hon. J. L. Camp.

*Hicks & Hicks*, for appellant.—There being no allegation, or evidence that the track at Tuna Siding was used by the employes to any greater extent or in any other way than any other portion of the main line, there was no obligation on defendant to maintain said track in such condition that its employes might use the ends of the ties as a safe place to walk or stand upon.   Bailey on Master and Servant, par. 106; Stetler v. Chicago and N. W. Ry., 46 Wis., 497; Texas & P. Ry. v. Hemphill, 38 Texas Civ. App., 435.

Before a party can be held liable for injuries alleged to have resulted from his act of negligence it must appear that such negligence was the proximate cause of such injuries, that is, it must appear that the accident which resulted in such injuries was such as a reasonably prudent man, in view of all the facts, would have anticipated—not necessarily the precise, actual injury, but some like injury produced by similar intervening agencies.   Texas & P. Ry. v. Bigham, 90 Texas, 223; Seale v. G., C. & S. F. Ry., 65 Texas, 274; Selleck v. Lake Shore Ry., 58 Mich., 195; Milwaukee v. Kellog, 94 U. S., 469; Pennsylvania Co. v. Hensil, 70 Ind., 569.

The evidence of the alleged negligence must be such as to make it reasonably probable that such fact existed, and where the only evidence of it is that of plaintiff and it appears that his knowledge of the existence of such alleged negligence was nothing more than a surmise and that he did not and could not know certainly of its existence the evidence is insufficient to sustain a verdict, especially

where it is contradicted by the physical facts and the positive statements of eye-witnesses. Gulf, C. & S. F. Ry. v. Wilson, 59 S. W. Rep., 590; Missouri Pac. Ry. v. Somers, 78 Texas, 411; International & G. N. Ry. v. Garcia, 75 Texas, 583.

Where the undisputed evidence shows that if a certain alleged rule of defendant was in force that plaintiff has breached the same and that such breach must of necessity have been a proximate cause of plaintiff's injury, the defendant is entitled to special charge, if requested, which assumes the fact of such breach and of its being negligence and the proximate cause of the accident in case the jury should find that such rule was in fact in force at the time of the accident. Denham v. Trinity County Lumber Co., 73 Texas, 82; Houston & T. C. Ry. v. Burling, 37 S. W. Rep., 1083; Gulf, W. T. & Pac. Ry. v. Cornell, 84 Texas, 80; Galveston, H. & S. A. Ry. v. Brown, 95 Texas, 2; Pilkington v. Gulf, C. & S. F. Ry., 70 Texas, 229.

*John Sehorn,* for appellee.

NEILL, Associate Justice.—This suit was brought by appellee against appellant to recover $40,000 damages for personal injuries. As grounds for his recovery plaintiff alleged that while he was in defendant's employ as a brakeman on a freight train, it became his duty to go upon the main track of defendant's road at Tuna siding to flag an approaching passenger train, and while thereon he stepped upon the end of a cross-tie, which, by reason of its rotten condition, crumbled beneath him, threw him down and his head struck one of the rails rendering him unconscious; and when in such condition the passenger train struck him in the face and injured him.

The grounds of negligence alleged were: (1) in permitting the defective and rotten cross-tie to be and remain in the track; (2) in failing to discover plaintiff lying on the track; and (3) that the employes in charge of the passenger train saw plaintiff and failed to use the means at hand to avoid striking him.

The defendant answered by a general demurrer and general denial, and pleaded specially:

1. That plaintiff was a brakeman on a northbound freight train which had stopped at Tuna with its rear end obstructing the main line; that it was his duty to go ahead of his engine and flag an approaching southbound passenger train, which did not arrive until some time after the freight train took the siding; that while waiting for the train, he lay down near the rails and went to sleep, and, while asleep, was struck by the passenger train, that by reason whereof his injuries were the result of his own negligence.

2. That there was no station at Tuna and no switching done there, and that the track was not designed as a pathway for its employes, and defendant owed plaintiff no duty to keep the track there in safe condition to walk on; that there was between the siding and main line a space eight or ten feet wide, smooth and safe to walk on and that it was not necessary to go upon and stand

on the main track to flag the train, and that plaintiff was guilty of negligence in doing so.

3. That plaintiff knew the condition of the track at Tuna and assumed the risk.

4. That plaintiff was guilty of negligence in going upon the track unnecessarily in front of a moving train.

5. That plaintiff, at the time he was struck, was opposite the cab of the engine of the train; that, under the time-card and rules, it was his duty to have flagged at a point several hundred feet north of the point where he was struck and that he was guilty of negligence in being there.

6. That if plaintiff attempted to flag the passenger train he did so from a point opposite the cab of the engine of the freight train and behind the headlight of such train; that said headlight tended to throw him in the shadow of the engine, and he was guilty of contributory negligence in attempting to flag from that point.

The case was submitted to the jury only on the first ground of negligence alleged; the verdict rendered was for $18,566.20, and for that sum the judgment appealed from was rendered.

*Conclusions of Fact.*—As these conclusions will determine the question as to the validity of the judgment, we will state the evidence at some length.

Tuna is a siding on defendant's railroad, between Cotulla and Laredo, it being about eight miles south of the first named station. No station nor telegraph office is maintained there, it being used ordinarily only as a siding for the passing of trains.

On June 2, 1905, the plaintiff was head brakeman on one of defendant's freight trains, which left Laredo about 10 o'clock at night, going north, and was to pass the southbound passenger on defendant's road at Cotulla. But the trainmen, finding that the freight train could not reach Cotulla on time, ran it on the side track at Tuna in order for the passenger train, as it had the right of way, to pass it at that station. The freight train was a long one, having in it, besides the engine and tank, some 30 odd cars, and could not, on account of its length, as an entirety, occupy the siding. With the engine on the northern extremity of the siding, the caboose and the car next to it in the rear of the train standing on the main track were, of course, an obstruction to the passenger train approaching in the opposite direction.

It was about 3:10 a. m. when the freight train took the siding at Tuna. It was then plaintiff's duty to put out signals and warn the southbound passenger train of the fact that the main track was obstructed by a part of the freight train. The warning and signals should have been given in accordance with and in obedience to rule 7 promulgated by the company to meet such conditions as were then present at Tuna, which rule is as follows:

"Torpedoes and red signals must be carried on all engines, baggage cars and cabooses, and by all bridge and track foreman, to be used to stop trains when necessary.

"When a train, from any cause, has to stop on main track in such a position as to endanger it from approaching trains, it must

be protected by torpedoes and red signals in the following manner: Flagmen will place *one* torpedo on the rail at least twenty telegraph poles from his train; place *one* torpedo on the same rail at a further distance of ten telegraph poles from the first torpedo and then take a position about midway between the two torpedoes to stop the train with red signals. In case the flagman is called in before any train arrives, he will take up the torpedo nearest his train, and return to his train as quickly as possible, leaving the furtherest torpedo from his train on the rail.

"When an engine explodes the first torpedo, the engineer will call for brakes, and trainmen will bring the train under full control soon as possible, and if no further indication of danger is discovered, the train will proceed cautiously until the conductor and engineer are satisfied that the track is clear. Should the engine explode the second torpedo the engineer and trainmen must use all means at their command to bring the train to a *full stop quick as possible,* and not proceed until they know positively that the track is clear."

Instead of acting in obedience and in conformity to this rule, the plaintiff, when his train took the siding, as before stated, got down from the cab of the engine and took his seat on the end of a crosstie of the main track, opposite the rear end of the engine, and awaited the arrival of the passenger train, with his lantern sitting on the ground beside him, and, according to his testimony, sat there about an hour and 15 minutes when, at about 4:30 in the morning, he first saw the passenger train, at the distance of about a mile, approaching on the main track from the north.

Here we deem best to state in his own language what he says occurred: "I looked up the track and saw the passenger train coming; I got up and flagged them with a lamp, with a white light, an ordinary lantern; I swung the lantern across the track. When I started flagging the passenger train was about a quarter of a mile. I got up and made a step forward; I guess I stood on the track flagging a minute or two; no, not that long; a few seconds, I guess; I guess I swung my lantern four or five times; then stepped forward, then sideways. I was near the middle of the track; then I stepped to the left side of the track, what I would call left the way I am sitting, the side the engineer is on coming, and I thought in so stepping over to the left side he would be more apt to see me because of our light burning, and as I did so I stepped on a tie, rotten tie, and it gave way under me and my foot went out and down I came and that is all I remember. I don't remember a thing after that. When I came to myself I was in Santa Rosa hospital. I was unconscious three days and was in the hospital when I came to myself. When I stepped on it (the rotten tie), why it just crumbled under my feet and broke right down with me. I fell backwards. If I had fell frontward I would have been lucky. The passenger train was about 300 feet or more from me when I fell. I can't say whether they saw me flag or not. They ought to have seen it; I will say that. I don't say they did; they ought to."

As to plaintiff's injuries, the evidence shows the roof of his mouth

was split open, his head was practically split from his teeth down through the inside of the eye cavity, the bottom of the nose and through the teeth clear back through the hard bone of the palate and that the bone of his forehead and upper part of his head was crushed.

No one of either crew witnessed the accident. All the members of the crew of the freight train, except the plaintiff, testified that they were asleep when the accident occurred. Emil Meyer, the fireman on the engine of the freight train, testified that before reaching Tuna plaintiff was sitting on the seat box in the cab of the engine and that he noticed he was nodding occasionally and asleep a time or two, at least that he had his eyes closed and was not saying anything, and seemed like he was asleep. That after the train lined up on the switch at Tuna plaintiff got off the engine and sat down on the main line opposite the engine, that he saw him about 15 or 20, probably 25 to 30, minutes before the accident, after witness ate a lunch, sitting on the end of the tie on the main line with his lamp between his feet, and he was nodding and he made a break to lie down, but whether he did or not the witness could not say. When the witness was asked what he meant by saying he "made a break to lie down" he answered as follows: "Why, he just moved around as though he was going to lie down lengthwise on the tie, just eased himself around. That is the last thing I seen him do. I was smoking a pipe and was in the gangway after eating a lunch, and I went in on to the seat box and went to sleep myself."

Henderson, engineer of the freight train, testified: "I was engineer on the freight train at Tuna. I did not see Rieden at the instant he was struck. I was sitting in my cab sleeping. I had nothing to do except to see that the engine did not die; I had recruited the fire a few minutes before I fell asleep. I suppose I had been asleep about 25 minutes; I kept the fire going because the fireman was very much fatigued and he had fallen asleep before I did and I did that just to give him a chance to rest a little; the last time I saw Rieden before the accident he was sitting on the end of a tie on the main line about two or three feet in advance of my seat, north or about the north end of the cab, parallel to the north end of the cab; my engine stopped in the siding just close enough to the north end to clear the main line. I did not pay any particular attention to Rieden; I think I addressed him a word or two while I was in the cab, something in regard to 'I guess we are stuck here till maybe daylight, or longer,' or something like that; I don't remember taking any notice of him more than that; he was sitting on the ties; I don't remember what answer he gave, but something, he answered 'I guess so;' or something of that sort; I first knew Rieden was hurt immediately after the passenger train stopped; as the engine was passing my engine the bell was ringing and that woke me. I saw the train was coming to a stop; I presume the engine had passed my engine two car lengths when I saw Engineer Ayrer going back with a torch and I supposed he was going back to notify me of something; when he arrived I asked him what it

was, and he said, 'I think I struck something,' and I wasn't more than two steps from the gangway of my engine; and I immediately turned my torch and held it up and saw Mr. Rieden lying there and blood flowing from his head; I think he was about the north end of the cab, maybe a little further toward the rear end of the cab; I took his head on my knees and with 'waste' attempted to wipe the blood and dirt from his face, and we immediately placed him in the caboose and went to Cotulla and set out the train and came to San Antonio with him in the caboose; we summoned a doctor at Cotulla; that was the closest place where a doctor could be gotten, and I believe the doctor came on to San Antonio. As the pilot of an engine moves along the track it extends 6 or 7 inches over the rail; it is about 3 inches from the top of the rail to the tie. The last time I spoke to Mr. Rieden I do not know what he was doing or what his position was in reference to the track; I do not know whether he was sitting down or lying down, because I did not look at him; the last time I saw him was immediately after we stopped on a side track; not over 5 minutes, or something like that; I just said, 'I guess we are stuck here for an hour or two,' and I think he answered me, 'yes, I suppose so.' No, I didn't mean to state a moment ago that I saw Rieden after the fireman went to sleep; the fireman didn't go to sleep, I don't think, for 20 or 25 minutes, or possibly 30 minutes, after we had stopped there."

Ayrer, the engineer on the passenger train, testified; "I was the engineer on the passenger train on the night Rieden was injured at Tuna. The train had a time order to make Cotulla and didn't make there; I naturally looked for it at Tuna, a mile, about two and a half miles north of Tuna there is a knoll, and then the track is depressed about a mile north of Tuna and straight so that you could see at least a mile and a half or two miles the way that train was standing if the lights are burning, and this train had a bright headlight burning, and I approached the station at a reasonably low rate of speed, about 12 or 15 miles an hour, and saw the headlight burning, and saw the train didn't clear—I could see the lights of the caboose, or rear .end of the caboose, looked to be about the center of the track, and I also saw a lantern, such as trainmen use, as much as two city blocks away, probably six hundred feet; well, I saw it when I was approaching the station and it was sitting between the main track and the siding, and I didn't know whether it was nearer the one or the other, but know that it was sitting in that position about opposite the engine that was on the siding, and as the engine passed by—the engine I was running— as it passed by the other engine, struck some object, or something knocked this lantern over; I saw the lantern as something knocked it over, and it went out; I then stopped and went back with a torch to see what it was; I stopped and told the conductor that I had knocked a brakeman off the track, or something had knocked the lamp out, and went back and found this man Rieden with his face and head injured, and apparently in convulsions from the injuries received. The lantern opposite the engine was stationary, sit-

ting on the ground; I never saw it move until it went out; apparently knocked out; as my train approached I got no signals from any person around the freight train and I saw no object opposite the lantern on the ground or near the track. I saw nothing on the ground except a lantern. The electric light from the engine in the siding would hide anything behind it unless it was a light, the electric light was very bright. It had the effect of blinding me from seeing any object unless it .was another light; the other light, of- course, would look very dim in comparison with an electric light; the light on the ground was a trainman's lamp; I think I passed the switch stand at about 10 or 12 or 15 miles an hour; I stopped with the chair car opposite the freight engine or opposite the man that was struck; only the baggage car and smoker passed him; I saw nothing until as the lamp was knocked over I thought I saw a moving object there on the ground; afterwards I saw a pair of gloves lying across the rail; the gauntlets on one side and the fingers on the other had been lying across the rail in this fashion; they were right opposite where Rieden was lying; I did not pick them up; when the light went out it was between my cab and the front of my engine."

Smith, the fireman on the passenger train, testified: "I was fireman on the passenger train; as our train approached Tuna I was looking down the track toward the end of the train standing on the siding; I did not see any signal that night as we came into the siding. No, there was no signal given; the first I knew that anything was the matter was when the engineer put his air in the emergency; our engine was right opposite the engine on the side track at that time; we ran about two car lengths and a half; I did not go back with the engineer to where Rieden was; I went back later; he was lying there when I got there. I did not stay there; I just glanced, saw who it was and went back to my engine and did not get off my engine any more."

Lewis, conductor on the freight train, testified: "I was conductor on the freight train at the time Rieden was injured: I was in the caboose; I did not see him at the time he was struck; the first I knew he was injured was when I got up to the front end of the train and saw what was the matter; I did not think anything was the matter, but the passenger train stopped up there and that was unusual, and I went up to see what was the cause of it. I saw Rieden 35 or 40 minutes previous to that; I saw some gloves on the rail there the night of the accident, they were lying across the rail. They were on the right hand rail on the main line going south; that is, the west rail. Mr. Monahan, conductor of the passenger train, picked them up and gave them to me; I locked them up in the caboose; I do not know what became of them; I also locked up Rieden's hat; I missed them several days afterward; I locked them up in the locker and several days afterwards when I went to the locker the gloves were missing and the hat, too; I haven't seen the gloves or the hat from that day to this; I have no idea what became of them; I haven't got them."

Monahan, conductor on the passenger train, testified: "I didn't

know anything about the accident until after it occurred; after the engineer stopped and got off his engine I went back to where Rieden was lying and found we had struck him. I was not looking down the track as we approached Tuna; we put Rieden in his caboose and he was taken to Cotulla; I then went to the section house and 'phoned to Cotulla to have a physician meet him on the arrival of their train. I found a pair of gloves lying on the rail near where Rieden was picked up; that is, after we had picked Rieden up; they were lying on the rail, one on top of the other; the fingers were cut off; I mean the fingers of the gloves; they were gauntlet gloves, and were lying in this manner with the fingers inside; the flange of the wheel had cut the fingers off and left the gloves; the palm of the gloves and gauntlet on the outside."

No one testified to having noticed a rotten or crumbled cross-tie upon the track after the accident occurred. The section foreman of that section of the road where the accident happened testified that he repaired the track at that place a short time before, and that he was confident that the ties were all safe and sound on the end; that he knew they were on the ends, but probably there might have been one rotten one in the center which would have nothing to do with the end of the ties.

From the evidence disclosed by the record we conclude: (1) That it shows conclusively that the defendant was not guilty towards plaintiff of any negligence which caused his injuries; and (2) That he was guilty of contributory negligence, as a matter of law, and that such negligence on his part was the proximate cause of his injuries. The correctness of these conclusions of facts will clearly appear from our conclusions of law relative to the evidence from which they are deduced.

*Conclusions of Law.*—While it is the duty of the master to exercise ordinary care to furnish his servant a reasonably safe place to work, the obligation is generally restricted to the purpose for which it was designed. The master is not ordinarily required to answer for an injury to his servant, where the emergency which tested the fitness of the place arose from a use for which it was not designed and which he could not reasonably anticipate. Hence the rule, that an employer is not liable where the servant's injury, was not caused by any defect in the place which affected its safety, when used in the ordinary way and for the purpose it was intended.

The purpose for which a railroad track is constructed and maintained is for running engines and cars over it; and the rule, which imposes the duty upon a railway company to exercise ordinary care to keep its roadbed and track in a reasonably safe condition for its servants, is primarily intended for their protection when engaged in operating its trains. If the company has discharged this duty, though its roadbed or track may not be reasonably safe for the use other exigencies may require, there is ordinarily no liability incurred for an injury to a servant caused by a defect in structure or material when tested by its fitness for the different use to which it was put by the servant when his injury was caused.

But if the company uses its road as a place or instrumentality for its servants to do other work than running trains over it, then, it must exercise ordinary care to maintain it in a condition reasonably safe for them to do such work. As incident to operating trains over a railway, the track and roadbed must at divers times and places necessarily be used for different purposes. When such different use by the servant is either imposed by the company or its requirement can be reasonably anticipated by it or its representative, then it must exercise the same care for the safety of the servant in doing the work as is required when he is engaged in operating trains over the road; that is, ordinary care that it shall be a reasonably safe place for the servant to do the work.

As an incident to operating trains, cars must be coupled and uncoupled in placing them in or taking them from the train and moved from one track to another. In making up trains this is generally done in switch-yards where switches, switch-stands, frogs, side-tracks, etc., are maintained for such purpose. In doing this work, which, under the most favorable conditions, is perilous, the duty of exercising ordinary care (which is gauged by the danger to the servant) is imposed upon the company to maintain the grounds, tracks and all appliances and instrumentalities in the switch-yards, for doing it in a reasonably safe condition. The cases of Louisville & N. Ry. Co. v. Bowcock, 51 S. W. Rep. (Ky.), 580; Whitcher v. Boston & M. R. Co., 46 Atl. Rep. (N. H.), 740; Preston v. Cent. R. & B. Co., 11 S. E. Rep. (Ga.), 143; Missouri, K. & T. Ry. Co. v. Kirkland, 11 Texas Civ. App., 530; Galveston, H. & S. A. Ry. Co. v. English, 59 S. W. Rep., 627; San Antonio & A. P. Ry. Co. v. Gillum, 30 S. W. Rep., 697; San Antonio & A. P. v. Williams, 52 S. W. Rep., 89; Galveston, H. & S. A. Ry. v. Slinkard, 17 Texas Civ. App., 587; Gulf, C. & S. F. Ry. v. Redeker, 67 Texas, 187; Missouri P. Ry. Co. v. Jones, 75 Texas, 151; Howe v. St. Clair, 8 Texas Civ. App., 104; Southern P. Co. v. Markey, 19 S. W. Rep., 392; Galveston, H. & S. A. Ry. v. Pitts, 42 S. W. Rep., 255; Missouri, K. & T. R. Co. v. Keefe, 84 S. W. Rep., 679, and St. Louis & S. F. R. Co. v. Ames, 94 S. W. Rep., 1112, cited in appellee's brief, are simply illustrative of this principle; and, unless the case under consideration can be brought within it, have no application to it.

The work of coupling and uncoupling cars, especially from the manner it was done before they were equipped with automatic couplers, requires the roadbed to be free from such defects or obstructions as might reasonably be supposed to unnecessarily increase the danger. Hence, duty of the company to use ordinary care to keep that part of it designed for such work free from such defects and obstructions. But in flagging or signalling a train the same danger is not encountered by the flagman that is by the brakeman in making a coupling, or, at least, one could not be expected to anticipate such danger, nor to exercise the same degree of care to keep the roadbed free from holes, slivers, protruding or rotten cross-ties, ditches, etc., as he would a place where switching is to be done. Any portion of a railroad track which is reasonably

safe to operate engines and cars upon is ordinarily reasonably safe for a man to go upon for the purpose of flagging a train, or to step off of when he has performed such services.

Accidents may arise in the operation of trains that may require a servant of a railroad company to go upon its track at any point along the line of road and signal an approaching train to stop in order that the danger arising from such accident may be averted. But when, where or how such accident will occur, which will require such a signal to be given, can not reasonably be foreseen. And, therefore, ordinary diligence does not require the company to have its roadbed, or material used in its construction, in such condition at the point where the signalling is to be done, as will free it from such defects as might in some way cause injury to the flagman in going on or off the track at that point. Koontz v. Chicago, R. I. & P. Co., 65 Iowa, 224, 21 N. W. Rep., 577; East Tenn., Va. & G. Ry. Co. v. Reynolds, 93 Ga., 570, 20 S. E. Rep., 70; McNiff v. Texas Midland Ry. Co., 26 Texas Civ. App., 558.

In the Georgia case just cited the plaintiff, who was the conductor of a train to which an accident had happened, undertook to go back on the track for the purpose of warning an approaching train; and, in going back to signal this train, he started across a trestle, and, when about half way across, he stopped on a cross-tie on the top of which was a small bit of decayed sap which slipped off or became loose from the tie, causing him to fall and become severely injured. In its decision the court said: "The real and immediate cause of this accident was the slipping of his foot upon the cross-tie, because of the giving way of the little piece of decayed sap upon its edge . . . he (plaintiff) had no cause of action against the company, unless it was negligent in allowing the cross-tie in question to remain in the trestle with the bit of decayed sap upon it. Relatively to the plaintiff we do not think this was negligence. It does not appear that the cross-tie was not otherwise sound and in all respects sufficient and suitable for the use for which it was intended. It was certainly not the purpose of the company, in having ties, to make a way for its employes to walk upon, but to make a safe roadbed for the running of trains. The simple truth is that the injury the plaintiff received was a mere casualty incident to the business in which he was engaged, and the ordinary risks which he assumed in accepting his employment. This seems too plain for argument. Accidents will happen, not only in the best regulated families, but upon the best regulated railways as well, and to allow the recovery to stand in the present case would be holding the company liable for the consequence of a mere accident for which it is in no fair view responsible."

From this it would seem, if it should be conceded that plaintiff's account of how he was injured were true, that the defendant was guilty of no negligence towards him which proximately caused his injury.

But such concession can not be made, unless it can be said that of all the witnesses upon the scene of accident, the plaintiff alone told the truth. For this, in view of the testimony of the other wit-

nesses as to the facts and circumstances surrounding the transaction, would stagger belief. Each of these facts and circumstances, testified to by a number of witnesses, is consistent, not only in itself with truth, but with such other, and wholly inconsistent with the truth of plaintiff's version of how the accident occurred. The engineer on the southbound train, knowing that the northbound freight was somewhere south of Cotulla, was keeping a vigilant lookout for signals; though he could see plaintiff's lantern sitting on the side of the track, he never saw him nor caught a signal from him. If plaintiff's testimony that he went upon the track and waved his lantern is true, the engineer must have seen his signals; and his testimony that he did not, must be false. The testimony of these two witnesses being so irreconcilable that one or the other is necessarily false, then, for the purpose of determining which was true, the enquiries would naturally be: Did either have a motive in telling anything but the truth? Whose testimony is most consistent with all the other facts and circumstances in the case? As to the first, the answer would naturally be: "Plaintiff saw before him thousands piled upon thousands of dollars dependent upon his testimony; but the engineer could see nothing ahead of him but a life of toil and danger, sanctified by fidelity to duty and a clear conscience." To the second the answers would naturally be: "The plaintiff's testimony is not corroborated by a single fact or circumstance testified to by any other witness; that of the engineer is consistent with and is corroborated by every fact and circumstance in evidence." If such should be the process of weighing the testimony of these witnesses, that of the plaintiff would be discarded, and that of the engineer believed. The result of this would not only be a failure of the plaintiff to make out his case (even if one could be builded upon his theory); but the testimony of the engineer, together with that of the other witnesses, would show that plaintiff was guilty of negligence as a matter of law which was the direct and only cause of his injury.

But regarding these as matters of fact lying within the exclusive domain of the jury, and assuming that it believed plaintiff and disbelieved the engineer, despite of stamp of truth impressed upon his testimony and its corroboration by all the other facts and circumstances in evidence, the question is still presented: Does his testimony, when viewed in connection with the undisputed facts in the light of the law, reasonably tend to show that the defendant was guilty of such negligence as entitles plaintiff to recover? To be actionable, negligence must be the proximate cause of an injury which, in the light of the attending circumstances, ought to have been foreseen as a natural and probable consequence of the negligent or wrongful act. (Texas & P. Ry. v. Bigham, 90 Texas, 223; Neely v. Ft. Worth & R. G. Ry. Co., 96 Texas, 275; Denison, B. & N. O. Ry. Co. v. Barry, 98 Texas, 248; Dullnig v. Duerler, 83 S. W. Rep., 889, 87 S. W. Rep. (Sup. Ct.), 332; Galveston, H. & S. A. Ry. v. Paschall, 92 S. W. Rep., 448; Gulf, C. & S. F. Ry. v. Hayter, 93 Texas, 239.) In considering the case from this viewpoint, we will put aside any question of negligence of defendant

regarding the rotten cross-tie or of plaintiff's stepping upon and being injured in consequence of it, and determine only whether, in the light of the attending circumstances, the injury ought to have been foreseen as a natural and probable consequence of such tie being there. To have reasonably anticipated the injury to plaintiff would have required the anticipation of a number of antecedent facts enshrouded by the future, among which may be stated: (1) That the northbound train would not arrive on time at Cotulla, and consequently the southbound passenger train would not pass it there, but would meet it somewhere south of there; (2) that the place where the trains would pass would be Tuna siding, where the freight train would take the side-track and await the arrival of the passenger train; (3) that the train being too long for the rear cars to clear the main track and occupy the side-track, plaintiff, in disregard of rule 7, would not go forward and signal as it required him under such circumstances, but would go on the main track, where he says he did, and signal the approaching train from there; and (4) that in stepping off the track, he would step upon the rotten end of the tie, fall and be knocked senseless and in such a position as to be run over or injured by the passenger train, by reason of the engineer not observing his signals.

One would have the gift of prophecy to have foretold all these events. But let us assume that the occurrence of the two first could have been anticipated, and direct our inquiry as to whether the third could. A railway company has the right to rely upon its servants obeying the rules it has ordained for the safety of its employes, its passengers and property. And if, in any instance, it can rely upon an employe discharging his duty, not only to his master, but to himself, his fellow servants and the public, it has the right to assume that when an occasion is clearly presented for a servant to obey a rule, which, if disobeyed, will imperil the servant's own life as well as the lives of others, that he will obey it to the letter.

The reason and purpose of rule 7 is obvious. That the occasion had arisen which required its observance; that the plaintiff knew the rule and that it was his duty to observe it; and that he disregarded it, are facts shown by the evidence to be equally clear. If, then, he had placed one torpedo on the rail at least twenty telegraph poles from his train, or from that part of it which was on the main track, and one torpedo on the same rail at a further distance of ten telegraph poles from the first torpedo, and then taken his position midway between the two torpedoes, to stop the train with red signals, he would not have been injured by reason of stepping on the rotten end of the cross-tie, nor could such an injury have been anticipated by the railway company. If the consequence of plaintiff's disobedience to this rule had been an injury to any of the employes on the passenger train or to any of his fellow servants, instead of an injury to himself, what defense would the company have had to an action brought by such injured party? We will assume, for the purpose of giving the answer in the same words that was given by the Supreme Court in a similar case, that the name

of the supposed injured party is "Murphy," and we have this answer: "The railroad company having established, by rules promulgated by it, a mode of procedure, under such conditions as existed at the time and place of the accident, Murphy, while discharging his duty, had the right to rely upon the observance of the rules by the trainmen, and to act as if the apparent conditions were real, and if Murphy was misled by the negligence of the conductor (brakeman) of the freight train, and was thereby injured, the railroad company will be liable." Murphy v. G., H. & N. R. Co., 100 Texas, 490. If a servant has the right to rely upon a duty personal to the master being discharged by the servant to whom it is entrusted, as between the master and the servant whom he has entrusted with such duty, the former has the same right to rely upon the latter's discharging it.

There is not the shadow of any circumstances creating such an emergency as would excuse the plaintiff from disregarding the rule in question (Galveston, H. & S. A. Ry. v. Brown, 95 Texas, 2), nor anything that, as between him and the defendant, which tends to show the slightest excuse for his disregarding it. The evidence shows beyond a peradventure of a doubt, not only that defendant could not have anticipated that plaintiff would be injured (as he says he was) by reason of the rotten tie, but that the proximate cause of his injury was his failure to signal the passenger train as required by the rule of the company, and that such failure on his part was negligence *per se*.

From this it follows that the court erred in its charge in submitting the case to the jury and in refusing defendant's request to peremptorily instruct a verdict in its favor. Further than this, it is unnecessary to consider those assignments of error which complain of the court's charge.

The judgment of the District Court is reversed and judgment is here rendered for the appellant.

*Reversed and rendered.*

Chief Justice James did not sit in this case.

Writ of error refused.