## LANCASTER et al. v. JARRETT. (No. 2823.)

(Court of Civil Appeals of Texas. Texarkana. Dec. 19, 1923. Rehearing Denied Jan. 24, 1924.)

**1. Master and servant &#9740;182(3)—Conductor's failure in duty as to delivery of duplicate train orders negligence as to engineer.**

Under Rev. St. arts. 6640–6642, the failure of a railroad conductor to comply with a safety rule requiring comparison of duplicate train orders delivered to the engineer is, as against the engineer, negligence chargeable to the railroad, the conductor being its vice principal.

**2. Negligence &#9740;65—"Contributory negligence" predicated on co-operating act.**

"Contributory negligence" is legally predicated on the fact that pegligence on the part of plaintiff co-operates with some negligence on the part of defendant.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Contributory Negligence.]

**3. Negligence &#9740;101—Under statute, contributory negligence merely diminishes damages.**

Under the statute, contributory negligence of an injured railroad employee merely diminishes the amount of damages, and the essential fact to legally preclude all recovery is that his omission or act charged in a given case, immediately and directly causing injury, is alone his fault, entirely independent of and disassociated with any concurring or co-operating act of the railroad or some of its employees.

**4. Negligence &#9740;141(12)—Instruction on comparative negligence held applicable to locomotive engineer's injuries in collision.**

In an action by a locomotive engineer for injuries sustained in a head-on collision, an instruction applying the statutory rule of contributory negligence diminishing the amount of damages *held* proper as applicable to the phase of the evidence showing that both the conductor and engineer failed in their duty to each other in the comparison of train orders, and also to that phase of the case seeking to base liability on the conductor's negligent failure to signal and stop his train.

**5. Master and servant** ⊕═>247(5)—**Engineer's failure to obey train order held direct cause of collision,· precluding any recovery for injuries.**

Where a railroad conductor handed to the engineer an order to wait at a special place for a specified period for an on-coming train at such special place, it was the engineer's duty to have obeyed the order, though the clearance card showed the track ahead clear, and his failure to do so, being the immediate and direct cause of a collision, precluded him from any recovery.

Appeal from District Court,· Harrison County; P. O. Beard, Judge.

Action by Z. L. Jarrett against J. L. Lancaster and others, receivers. From a judgment for plaintiff, defendants appeal. Reversed and remanded for new trial.

A head-on collision of regular through passenger train No. 3, going west, and regular freight train No. 66, going east, occurred at about 5:12 o'clock a. m. on the main line track of the Texas & Pacific Railroad, at a point one and one-eighth miles west of Camp's Switch. The appellee, who was the regular locomotive engineer operating passenger train No. 3, sustained personal injuries as a result of the collision, and he brings this action for damages.

The negligent acts of the appellant upon which the appellee relies are set forth in his petition substantially as follows: (1) That the authorized agent of the railway company delivered to plaintiff a train order directing him, as the engineer, ·to operate passenger train No. 3 as a superior train from Longview Junction west to Gladewater, a telegraph station, and to wait at Gladewater until 5:15 a. m., and accompanied such train order with a "clearance card," reciting that the "block" or space between Longview Junction and Gladewater was "clear" of any other train; that in truth and in fact, and without any notice thereof to plaintiff, freight train No. 66 was at the time being operated by the defendant over the main line track from Gladewater to Camp's Switch, in a manner and at a time such as to cause it to meet passenger train No. 3 on the main line between Camp's Switch and Gladewater, causing a head-on collision; (2) that the conductor of passenger train No. 3, charged with the duty of directing the engineer to stop the train, negligently permitted the said train No. 3 to pass Camp's Switch, knowing at the time that he had direct orders to wait there for freight train No. 66 until 5:15 o'clock a. m.

The defendant answered by general denial, pleaded contributory negligence, and further specially averred, in avoidance of any liability, that the direct and proximate cause of the plaintiff's injury was his failure and refusal to read and his failure of compliance with and obedience to train order No. 14

commanding him to wait at Camp's Switch until 5:15 a. m. for east-bound freight train No. 66.

The evidence shows that freight train No. 66 was a regular freight train being operated east to Longview Junction, and that passenger train No. 3 was a regular through passenger train carrying both interstate and intrastate passengers. The appellee was the regular locomotive engineer of the passenger train on its run between Marshall and Fort Worth. On the particular run involved in the suit the train left Marshall, going west, about 35 minutes later than its schedule time. It arrived at Longview Junction about 4:45 o'clock a. m., and left there about 4:55 o'clock a. m., which was some 55 minutes later than its schedule time. Regular passenger train No. 23 from ·New Orleans, bound west, was regularly scheduled to run ahead of passenger train No. 3 out of Marshall, but on this occasion was some 2 hours or more late, and had not reached Longview Junction, and as a consequence passenger train No. 3 was made the superior train in the run west out of Longview Junction. Longview Junction is a regular stop for passenger and freight trains, and is a regular telegraph station with a telegraph operator stationed there. The engineers and the conductors of trains receive orders at this place. Gladewater is the next regular telegraph station, and is located about 14 miles west of Longview Junction. Between Gladewater and Longview Junction there are maintained two switch tracks— one at Willow Springs, 4 miles west from Longview Junction, and the other at Camp's Switch, 9 miles west of Longview Junction. Under the rules and practices of the railway company it was the duty of the conductor to go to the telegraph operator at Longview Junction and to procure from him all the train orders to control the movements of the train between Longview Junction and Gladewater. The space between these two places is termed a "block." At the time these orders are issued it is the duty of the telegraph operator to issue to the conductor for the engineer either a "caution card" or a "clearance card." A caution card informs the engineer of any danger arising from the presence of any other train that may be operating in the "block." A clearance card is one showing on its face the "train orders" by numbers and the form they are issued on, and either that "the block is clear" or "the block will be occupied," as the true facts might be. There are two forms for train orders. One, that is issued on blue paper, is styled "form No. 19," and has reference to the condition of tracks, water tanks, etc. The other is issued on yellow paper, and is styled "form No. 31," and has reference to the movements of trains. When a conductor receives orders on form No. 31 with reference to the movement of trains, he must sign

for them when he takes them from the telegraph operator's office. He does not have to sign for orders on form No. 19. These orders are all issued in duplicate; one set for the conductor, and one set for the engineer. The rules of the railway company require the engineer, when he receives the train orders from the hands of the conductor, to read the orders aloud to the conductor so that the orders can be compared. When passenger train No. 3 reached Longview Junction, the following orders, applicable to passenger train No. 3, had been received by the telegraph operator from the train dispatcher's office, and had been written out, viz:

Order No. 911, reading:

"All trains west take full tank water at Big Sandy or Angler. All trains east favor water station Wills Point."

Order No. 912, reading:

"All trains reduce to 4 miles per hour over bridge 236–7, and 5 miles per hour over bridge 2005."

Order No. 3, reading:

"Engine 518 run second No. 67 Longview Junction to Fort Worth ahead of No. 23 and No. 3 until overtaken."

Order No. 8, reading:

"No. 3 engine 700 wait Gladewater until 5:15 a. m.; Wilkins 5:22 a. m.; Ferguson 5:35 a. m.; Hawkins 5:50 a. m. No. 23 engine 707 wait Willow Springs until 5:25 a. m.; Gladewater 5:35 a. m.; Ferguson 6:05 a. m. No. 3 engine 70 run ahead of No. 23 engine 707 Longview Junction until overtaken."

At the same time the telegraph operator made out a clearance card, applicable to passenger train No. 3, which recited: "Block is clear." A few minutes before passenger train No. 3 left, the following train order, and which was the last one, was received by the telegraph operator from the dispatcher's office, viz.:

"Train order No. 14 No. 3 engine 700 wait Camp's until 5:15 a. m., and No. 23 engine 707 wait Willow Springs until 5:45 a. m. for first No. 66 engine 538."

This order was issued to change order No. 8, and to annul it. This order, as the telegraph operator testified, "was received on the '19 form' at 4:48 a. m.," which was about "6 or 7 minutes" before the time passenger train No. 3 left Longview Junction. The telegraph operator further testified:

"Yes, I issued order 14 on form 19. We have a form that we call 31, that is on yellow paper. The 19 form is on blue paper. The 19 is used to help out when you don't get the conductor's signature to them, usually handed up without stopping the train. The 31 order takes a higher rank than a 19 order. The 14 order was the last order I received. I did not give the conductor a caution card. The only reason I had for not giving him a caution card

258 S.W.—18

was that I would have to take up his clearance card and make out a caution card, and it would take some length of time, and I was in a hurry to get them out, and the conductor was also in a hurry to move his train. I should have torn up the clearance card and have given him one showing 'the block is occupied.' It would have been the proper procedure and good railroading for me to have given another card in the place of this one. Under the rules and regulations I should have done so. * * * The dispatcher told me to tell the conductor that his train would go to Camp's Switch. I didn't put that statement in writing. I told the conductor orally. I do not know whether he told the engineer or not. I told the conductor, and he was in charge of the train. The conductor is the boss of the crew, and his crew are supposed to obey him."

The conductor of passenger train No. 3 went to the telegraph operator for orders, and, as testified, he received from the operator orders 911, 912, 3, 8, and 14, together with a clearance card. The conductor testified:

"I went to the operator's office, and got the orders for my train. I got copies of these five orders I have here now in my hand. I recognize those orders as copies of the ones I got. I got a copy of clearance card like this one. I got orders 3 and 8 on 31 form, and orders 911, 912, and 14 on 19 form. I got those orders in the telegraph office at Longview Junction, and they were delivered to me by the operator. I got two copies of each order and of the clearance card. Orders 3 and 8 were on the 31 form, which I signed for; the other three orders were not to be signed for by the conductor, but by the operator. On the clearance cards there appeared and showed in the space for 'train orders' under 'form 31' the 'orders 3, 8 for your train,' and under 'I have orders form 19' the 'orders 911, 912, 14.' Each clearance card showed that. He handed these orders to me at the desk, and I separated them; that is, I stacked them in two different stacks. On the top of the engineer's stack I put the clearance card. I put a register check on the card and the five orders. I carried them up and delivered them direct to the engineer, and delivered them to him in person. When I delivered the orders Mr. Jarrett was standing on the left-hand side of the cab in the gangway of the engine. Mr. Jarrett then walked to the north or right-hand side opposite to where I was standing, and turned the cab light on, and started to read the orders. I suppose he was reading them, as he was looking at them. It was Mr. Jarrett's duty to check his orders against the clearance I gave him. If any of those orders were missing, it was Mr. Jarrett's duty to come to me and know if I had the order, or go to the telegraph office and see if the operator had delivered them to me, and not to leave without the order. I know most assuredly that I gave him order No. 14. After I gave him the orders, I turned and went back, and watched them load baggage and mail, and about the time they finished I gave him a signal to go ahead. Mr. Jarrett's duties were, when I delivered him these orders, to read them aloud in my presence. He did not do that. I waited

to see if he was going to read them aloud from between 15 and to 20 seconds before I left the engine."

Continuing, the conductor testified:

"After I got and read my orders I gave them to my brakeman. Order No. 8 was on form 31, yellow paper. Order No. 14, countermanding that order, was on form 19, blue paper. Order No. 14 says, 'Wait at Camp's until 5:15 a. m.,' and it countermands order No. 8. Both of these orders should have been put on form 31. I do not know why order No. 14 was put on the '19 form.' * * * It has been customary to operate trains of this character and to issue this kind of order on form.19, and has been ever since the rule went into effect in 1912. I have given orders of this kind to Mr. Jarrett before. * * * I did not hear the whistle for Camp's Switch. I was still busy working the train. * * * First 66 was the train coming east. It was between 5:11 and 5:12 a. m. when train No. 3 struck first 66. I believe the record shows we were one and one-eighth miles west of Camp's Switch when we struck them. If Mr. Jarrett had read order No. 14 and had obeyed it at 5:12 we would have been at Camp's Switch, about 75 yards east of the west frog of the switch. Mr. Jarrett did not have authority to pull that train past Camp's Switch before 5:15 a. m., unless first 66 had been in the clear. * * * With that order No. 14 it would have been proper to have delivered a caution card with those orders. The caution card is a double precaution; in other words, calls attention to the fact of a meeting point, or that some one is ahead of you, or the block is occupied. If I had carried a caution card to the engineer and had the engineer obeyed it, there would not have been any wreck; and if he had obeyed order No. 14 there would not have been any wreck."

The appellee, as material, testified:

"I got my train orders at Longview Junction. The train orders were given to me afer I backed up from the water tank and coupled up to the train, while I was testing the air. The conductor brought me my train orders. H gave me a clearance card with the orders. I got four orders with my clearance card, and none of those orders gave me any information about other trains between Longview Junction and Gladewater. According to the order I got and the clearance card my first stop after leaving Longview Junction was Gladewater. When I received those orders from the conductor it was in the dark. He handed them up to me from the ground. I reached down and got them, and I stepped back to the right-hand side, and under the cab light read them. I then stepped over to where the conductor was. He was gone. After I saw that the conductor was not there I handed the orders over to the fireman to read. I looked again and the conductor was giving me a signal to go. I never received order No. 14, which had to.do with meeting a freight.train in the block between Longview Junction and Gladewater. The first intimation I had that I was going to meet another train was when I saw the headlight across the curve just west of Camp's Switch. It was a curve there to the right. I then applied the air and slowed down. The other train was approaching at a rapid rate of speed. I was running then about 40 miles an hour. The collision occurred; it was a fraction over a mile west of Camp's Switch. As I passed Camp's Switch the conductor did not give me a signal to stop. This accident occurred at 5:11 or 5:12 o'clock a. m. I looked at my watch when I whistled at Camp's Switch, and it was 5:09 a. m.; the whistling post is one mile east of Camp's Switch; there I whistled. * * * If I had received order No. 14 and read and obeyed it there would not have been any wreck. If I was handed an order among other orders on form 19 that read, 'No. 3 engine 700 wait Camp's 5:15 a. m.,' I would stop at Camp's Switch and wait. If I had that order I would obey it. If I was given an order like that by the conductor I would stop at Camp's Switch, no matter on what color of paper it was written. Order 14 was not shown on the clearance card. The clearance card did not have nor show the figures '14' on it."

The engineer knew of the rule of the company requiring him to read his orders aloud to the conductor. The fireman testified:

"Train No. 3 was furnished with orders at Longview Junction on this particular occasion. They were delivered by the conductor to Engineer Jarrett. After Engineer Jarrett read these orders, I read the ones he handed to me. After Mr. Jarrett read them, he handed them to me. No one else was present. It is the duty and practice of Engineer Jarrett to hand his orders to the fireman, and the fireman is required to read them. The engineer did so on this occasion. The orders that I received were issued on four slips of paper. These four slips were the only orders that I saw on this occasion. There was no caution card handed me in the batch by Engineer Jarrett. We were both on the engine at the time they were given to me. The road was clear to Gladewater as far as the orders read that I received. There was an order among the batch to 'wait at Gladewater until 5:15 a. m.' I did not see any order directing the train to wait at Camp's until 5:15 a. m. for any purpose. I read all the orders handed to me by Engineer Jarrett, which were four in number. I did not receive a clearance card from Engineer Jarrett, but I saw him with a clearance card in his hand after we left Longview Junction. I can't say that it was the card that he received at Longview Junction."

The brakeman on the passenger train testified:

"When the conductor handed me the train orders they were rolled up. My opinion was that the conductor handed me only four orders. Up to the time the accident occurred I knew nothing of the other order relative to meeting first 66 at Camp's. The conductor did not tell me that we would meet a train between Longview and Gladewater. If I were aware of meeting a train at Camp's Switch, or had a wait order for a train there, if the train was not in the clear, I would have stopped No. 3."

The court submitted the case to the jury on a general charge, and they returned a verdict in favor of the appellee.

F. H. Prendergast and George Prendergast, both of Marshall, and R. S. Shapard, of Dallas, for appellants.

Davidson, Blalock & Blalock, of Marshall, for appellee.

LEVY, J. (after stating the facts as above). The court's charge, in section 6, tells the jury, in effect, that, if they shall believe from the evidence that the conductor delivered train order No. 14 to appellee, and he "negligently failed to read and observe the same," or "if the plaintiff had read the orders handed him aloud to the conductor, and the absence of order No. 14 would have been discovered, and that by reason of the discovery of its absence it would have been supplied, and train No. 3 would have stopped at Camp's, and the accident avoided," then, "in either event the plaintiff would be guilty of contributory negligence," diminishing the amount of damages to which the appellee may be entitled. The appellants, timely excepting to the charge, predicate error upon the instruction upon the ground that it is affirmatively erroneous, as a misdirection to the jury of the law applicable to the facts therein stated. The point made by appellants, stated in effect, is that the facts upon which the instruction is predicated legally operate to eliminate the doctrine of "contributory negligence," merely diminishing the amount of damages, and to establish nonliability of appellants for any damages as a matter of law. As to whether or not the charge is based upon a misconception, as insisted by appellants, in whole or in part, of the law applicable must be determined in the light of the precise facts of this case. As admittedly shown, the collision occurred at 5:12 o'clock a. m., on a curve one and one-eighth miles west of and beyond Camp's Switch. Had the passenger train waited at Camp's Switch until 5:15 o'clock a. m., as directed to be done by order No. 14, the collision would not have occurred, as admitted by the record. It was undenied that order No. 14 was issued to countermand order No. 8, which was previously issued, requiring the passenger train to wait at Gladewater, distant 4 miles west of Camp's Switch, until 5:15 o'clock a. m. In all the facts the only conclusion that could justly be reached, and to which all reasonable minds must agree, would be that the appellants, though some of their employees were guilty of negligence, even unjustifiably so, from the viewpoint of the safety of the crew on the on-coming freight train and passengers on the passenger train, had the suit been brought by any one of them. But considering the case from the viewpoint of liability to appellee, as the engineer charged with the duty of safely operating the passenger train, the question is pertinent of whether the direct and imme-diate cause of the collision was due alone to his fault, or was due to some fault of his concurring with or contributing to the negligence of appellants or some of their employees. The appellee claims, stated in effect, that he was in no wise responsible for the collision, because he was complying with the orders handed him, and which contained the only information he had, and that such orders were the operative influences which led to his not waiting at Camp's Switch until 5:15 o'clock a. m., which was the immediate cause of his injury. He testified that the conductor never delivered to him order No. 14, and that he did not know there was "a fifth order," No. 14, which required passenger train No. 3 to wait at Camp's Switch, instead of Gladewater, until 5:15 a. m., and that he had no knowledge that there was an on-coming freight train to Camp's Switch, and that he operated the train out of Longview Junction and up to the point of collision in strict conformity with the clearance card and the four orders that he did receive. The evidence of the fireman and the brakeman strongly tends to corroborate him in the statement that he did not get order No. 14. The fireman testified that he did not find order No. 14 among the orders given to Engineer Jarrett. The brakeman testified that he did not find any order No. 14 among the batch of duplicate orders that the conductor had after he boarded the train. And the telegraph operator admits that he omitted to issue order No. 14 on the proper form, and omitted to issue the proper caution card required under the circumstances. On the other hand, the operator testified that he issued and delivered to the conductor order No. 14, countermanding order No. 8, which the appellee had, requiring the passenger train to wait at Gladewater until 5:15; and the conductor testified that he received the order No. 14 in duplicate, and delivered one to the appellee along with order No. 8 and the other orders and clearance card in evidence. They further testified that order No. 14 was noted on the clearance card given to appellee. Appellee denies this statement of fact. But it is conclusively established that the appellee and the conductor failed to read and compare their orders in the presence and hearing of each other, as required of them by a rule promulgated for the safe operation of trains on their trips over the road. And further, the record practically admits that the conductor, having information that passenger train No. 3 would meet freight train 66 at Camp's Switch by 5:15 o'clock a. m., failed to signal and require the appellee to stop at Camp's Switch, after seeing that he was not complying with order No. 14.

Considered in the several aspects of the evidence, it is manifest that the appellee could not be held legally responsible in any

wise for the collision, if the conductor did not in fact hand him order No. 14, and unless he could have gotten timely information of order No. 14 by verifying his orders, as the rule required, with the orders of the conductor. Clearly, under the evidence, appellee's failure "to read the orders aloud to the conductor" in order to compare and verify the orders was not purely voluntary and alone his fault. The appellee received the orders from the conductor in the nighttime, in the cab of his engine, at his post of duty. He at once turned to the light in the cab to see them, and then, as appellee says, "I stepped over to where the conductor was, and he had gone." He would have compared the orders if the conductor had remained there. The conductor, as he admits, "waited to see if he was going to read them aloud, from between 15 to 20 seconds, before I left the engine." The appellee did not tell the conductor that he was not going to read aloud and compare the orders, and there is no apparent reason why he stayed no longer than "between 15 to 20 seconds." He had no other imperative duty to perform, for, as he testified, "After I gave him the orders, I turned and went back and watched them load baggage and mail." "Between 15 to 20 seconds" is not a reasonable time within which to compare the orders. It was as much the duty of the conductor as of the engineer, under the rule, to make comparison of the orders. The conductor was charged with the duty of receiving duplicate orders from the operator, and to make personal delivery of one set of the orders to the engineer, and with seeing to it that the orders be compared in the presence and hearing of himself and the engineer. The very purpose of requiring the comparison of the orders is to enable them to discover then and there whether each one of them had the same orders and all the orders, general and special, issued for the operation and protection of that train. His duty, as was the engineer's, was as clear as its performance was easy. The safety of the train crew and the passengers is dependent upon that being done. The conductor was not merely a messenger to do no more than make a manual delivery of the orders to the engineer, and upon handing them to the engineer to leave right away in "between 15 to 20 seconds."

[1-4] The engineer and the conductor operate the train in common employment, having the immediate common object of running the train in conformity with the general and special orders issued to them. It is absolutely necessary to the safe operation of the train that they both understand and know of the same orders, and that each one of them have all the orders governing the running of the train. Consequently it cannot be said in the circumstances that the

engineer was wholly to blame for not knowing of and receiving order No. 14, if he did not get it, and without any concurring negligent act or omission on the part of the conductor. The omission and failure of the conductor to discharge his duty in this respect would, as against appellee, be negligence legally chargeable to appellants, for, under the statute, the conductor was standing in the relation of agent or vice principal of the appellants. Articles 6640–6642, R. S. Then, as both the conductor and the engineer failed in their duty to each other, there exists a legal justification for a comparison of negligences and the apportioning of their effect. This would constitute contributory negligence, for "contributory negligence" is legally predicated upon the fact that negligence on the part of the plaintiff "co-operates with some negligence on the part of the defendant." Under the statute contributory negligence does not bar any recovery, but merely diminishes the amount of damages. The essential fact to legally preclude from a recovery at all is that the omission or act charged to the plaintiff in a given case immediately and directly causing his injury is alone the fault of the plaintiff, entirely independent of and dissociated with any concurring or co-operating omission or act of the defendant or some of his employees. Therefore the court did not err in applying the rule of contributory negligence in respect to the matter discussed. And in this connection it may be observed that contributory negligence predicated on the failure "to read the orders aloud to the conductor" would also be applicable to that phase of the case seeking to base liability upon the negligent failure of the conductor, being the superior in control of the train, to signal and stop the train at Camp's Switch, knowing that it was there to meet freight train 66, and seeing that the engineer was passing the stopping place.

[5] In the other aspect of the evidence it is concluded that the appellants' contention must be sustained that, if the conductor handed to appellee order No. 14, then he would be precluded from any recovery if the failure to observe the order was the immediate and direct cause of the collision. For the immediate and direct cause of the collision would be his fault alone in knowingly disregarding a special order for his direction in safely operating the train to wait at a special place for a specified period of time for an on-coming train to that special place. In such case there is an absence of any negligence on the part of appellants immediately and directly causing the collision. All question of "contributory negligence" is eliminated. If appellee was handed special order No. 14 directing the train to wait at the special place of Camp's Switch until the special time of 5:15 o'clock

a. m., he should have obeyed that order, notwithstanding the fact that the clearance card showed the track ahead "clear." The negligent issuance of the clearance card would not be of importance in that respect, or be a co-operating or concurring cause in the collision, occurring, as it did, at a different place further from Camp's Switch, and 3 minutes before the special time of 5:15 a. m. had elapsed. The cause of the collision would not be incident to, but entirely independent of and intervening between, the appellants' negligence and the result of it. The negligent issuance of the clearance card, as a means to mislead the appellee, would only be a concurring or proximate cause of the collision in case appellee had waited at Camp's Switch until 5:15 a. m. and then left. He could not be held solely responsible for obedience to orders in that case. Quoting from Ry. Co. v. Ryan, 69 Tex. 665, 7 S. W. 83:

"An employer is bound to use due care to promote the safety of an employee, and if the employee knowingly and intentionally disobeys a reasonable rule or regulation established for his safety, unless he does so under the influence of fear produced by the appearance of sudden danger, and the act of disobedience is the proximate cause of the injury complained of, he cannot recover."

The same rule is applied in Ry. Co. v. Brown, 95 Tex. 2, 63 S. W. 305; Ry. Co. v. Reiden, 48 Tex. Civ. App. 401, 107 S. W. 661; Davis v. Payne (Or.) 216 Pac. 195; Ry. Co. v. Wiles, 240 U. S. 444, 36 Sup. Ct. 406, 60 L. Ed. 732. Appellee testified that had he received order No. 14 he would have obeyed it and stopped at Camp's Switch, even though and notwithstanding it was on form 19, and even though the clearance card showed the block "clear." In the operation of railroads it becomes necessary to issue special orders governing the operation of trains, giving information as to condition of the track ahead, and of the trains moving behind and ahead and on-coming. Conductors and engineers have knowledge of that fact and of the importance of such orders to the safety of operation. Obedience to such orders is required for the safety of the train crews and the traveling public. It seems just in principle to hold the engineer and conductor, in the interest of safety to the lives and limbs of people, to a strict sense of responsibility of attention to and observance of special orders like order No. 14. If the appellee received order No. 14 it would be presumed, in the discharge of his duty, that he read it. Observance of wait and meet train orders, and obedience to them, knowing, if so, that they are issued, is of too vital importance to the safety of human lives to be the subject-matter of momen-

tary neglect as a justification or excuse. As stated in the Wiles Case, supra, "To excuse its neglect would remove security from the lives of those upon the train."

The error complained of requires the judgment to be reversed, and the cause remanded for another trial.

## On Motion for Rehearing.

The appellee emphasizes the point that his conduct in operating the engine must be viewed from his standpoint of receiving at the same time a batch of train orders. And the contention is then made that there was error in the holding by this court to the effect that, if the appellee actually received train order No. 14 from the conductor, and failed to observe the order, and the failure to observe the same and wait at Camp's Switch until 5:15 o'clock a. m. was the immediate and direct cause of the collision, then the appellee would be precluded from any recovery. The insistence now is that, if the appellee actually received train order No. 14, and was confused and misled by the conflict in order No. 8, the clearance card, and the absence of the caution card, he would not be guilty of negligence per se, but then it becomes a question of contributory negligence. It may be that an ordinarily prudent person might have drawn one conclusion as to what the orders meant, or he might readily have been misled into drawing a different conclusion. But the converse of the proposition made is also correct, that, if the appellee actually received train order No. 14, and was not confused and misled by the conflict in the other orders, then in failing to observe order No. 14 he would be precluded from recovering, if such failure was the proximate cause of the collision. And it was entirely upon this latter rule that we concluded, in view of appellee's own evidence, that the charge in question was erroneous as not authorizing the jury to consider that particular phase of the case as made by the evidence in the light of the law applicable thereto. The appellee did not claim that he was confused and misled by the conflict in the orders, considered together. He claimed that he never received or knew of train order No. 14, and in operating the train relied entirely on order No. 8 and the information in the clearance card that "the block" was "clear." He testified, in particular, that if he had received order No. 14 he would have obeyed it and stopped at Camp's Switch until 5:15 o'clock a. m., even though the clearance card showed the "block clear," and even though and notwithstanding order No. 14 was on form 19, and "no matter on what color of paper it was written."

The motion is overruled.