Murphy sued the railroad company to recover damages for a personal injury alleged to have been received by him while he was in the employ of the railroad company, and while he was in discharge of his duties as section foreman. The trial court, upon the conclusion of the evidence, instructed the jury to return a verdict for the defendant, which was accordingly done, and judgment entered thereon in favor of the railroad company. Upon appeal by Murphy the Court of Civil Appeals affirmed the judgment.
From the conclusions of fact filed by the Court of Civil Appeals we make the following condensed statement of the facts of the case. On the 6th day of May, 1904, a freight train on the railroad of the defendant company passed the station of Harrisburg, in Harris County, going in the direction of Galveston, and stopped at Allen, a station two miles and a half from Harrisburg for the purpose of loading cattle which were to be shipped to the city of Galveston. The freight train was at that station during the greater part of the day loading the *Page 493 
cattle. Owing to the crowded condition of the sidetracks at the station it was necessary that a portion of the freight train should remain upon the main track while the cars were being loaded and switched for the purpose of making up the stock train for Galveston. The following rule was prescribed and in force with regard to trains when stopped at a station like that:
"99. When a train stops or is delayed, under circumstances in which it may be overtaken by another train, the flagman must go back immediately with stop signals a sufficient distance to insure full protection. When recalled he may return to his train, first placing two torpedoes on the rail, when conditions require it. The front of a train must be protected in the same way when necessary by the front brakeman; if the front brakeman is not available, the fireman must act in his place.
"(a) A sufficient distance to insure full protection requires that the flagman shall go back to a point thirteen telegraph poles from the rear of his train, where he must place one torpedo on the rail; he must then continue to go back at least fifteen telegraph poles from the rear of his train and place two torpedoes on the rail not more than two hundred feet apart, when he may return to within thirteen telegraph poles from the rear of his train, and remain there until recalled by the whistle of his engine; but if a passenger train is due within five minutes he must remain until it arrives. When he comes in he will remove the torpedo nearest to the train, but the two torpedoes must be left on the rail as a caution signal to any following train. The recall of the flagman is the most critical period, and when there is not a clear view of at least one-half mile, train should be moved forward a sufficient distance to insure safety before the flagman is recalled.
"(b) When a train is detained more than three minutes at any of its usual stops, the train must be protected as above provided.
"(c) Should the speed of a train be reduced and its rear thereby endangered, making it necessary to check a following train before a flagman can get off, a lighted fuse shall be thrown on the track at intervals to insure the absolute safety of the leading train."
Appellant testified that it was customary and the practice, whenever torpedoes were put out, for a flagman to remain with the one nearest the train until he is called in, and that it is not usual or customary to call him in until the train is ready to leave. It was explained by appellant that the purpose of requiring the flagman to stay with the torpedoes was to see that they were not removed and also to flag any approaching train in case the torpedoes failed to explode, and this is the reason why the time that elapses between the calling in of the flagman and the departure of the train is spoken of as the most critical. Appellant knew that torpedoes might be expected to be found anywhere on the track as it was customary to put them out when a train was detained over three minutes at any place, and that they were especially likely to be found within three-fourths of a mile of a station, watertank or other stopping places. A torpedo on the rail can be seen for one hundred and fifty or two hundred feet. When a torpedo explodes particles scatter in every direction for a distance of seven feet.
When the freight train arrived at Allen the conductor went back to the bridge on Sim's Bayou, seventeen telegraph poles from Allen, and *Page 494 
put out two torpedoes on the rails, one of them being upon the bridge. No flagman was stationed anywhere near to the torpedoes or the bridge, and the conductor returned to his work at Allen.
About one hour and a half after the freight train passed Harrisburg, Murphy and his crew left that station to go in the direction of Allen on a handcar with a pushcar in front of it. Murphy was riding on the pushcar with his feet hanging down on the outside. We copy his testimony as stated in the opinion of the Court of Civil Appeals as follows:
"I started out that afternoon with my men arranged as I have already stated, and they were arranged in that manner when I got hurt. There had been no change in the arrangement of them. I went by a water tank before I got injured. I saw no torpedoes there. Then we went on down towards Allen station. Before I approached this bridge within the distance I spoke of from Allen's, I was on the lookout for torpedoes, and after I got on the bridge at Sim's Bayou I saw this train at Allen's and I saw no flagman and I did not know, of course, how long the train had been there. I looked for the flagman when I saw the train, we always do that since the issuance of this rule, I saw no flagman and I came to the conclusion. I'd a clear track to this train; that there were no torpedoes, and I diverted my attention to other duties, to the wires and the bridge. Sim's Bayou being at that point, it diverted my attention specially because the water was very high, and there was drift, and I had to watch the embankments because they are soft there and because we had trouble there, and I had to look at the banks themselves. When I saw the train standing there I felt satisfied it was on the main track, but I could not say for certain. I looked for the flagman and saw none, then concluded I had a clear track, that there were no torpedoes. If there had been a flagman there I would have known there were torpedoes there. If the flagman had been called in I would have heard the whistle or I would have seen him before he could get to the train. I would have heard him being called in by the blasts of the whistle. From my ordinary experience in railroading he would have been called in when they were ready to go. It is not usual or customary for the flagman to be called in before his train is ready to start. I had not heard the blasts of the whistle, and I did not see the flagman at all. He was not on the track nor going towards his train, then I came to the conclusion there were no torpedoes, and nothing between me and it, and it was necessary for me then to give my attention to this bayou and the stream of water where the drift was coming down. If the flagman had been there it would have prevented me from getting hurt because I would have known there were torpedoes there and I would have seen him a half mile before I got to him. There would have been plenty of time to have stopped our car.
"The view approaching the bridge over Sim's Bayou to Allen's siding is obstructed, that is, until you get on to the bridge. It was timbered on the left hand side as you go down to the woods which would obstruct your view of Allen's until you got about on the bridge then you could see Allen's. When I got on the bridge I saw this train which I believed to be on the main line. I did not notice that train when it passed us at Harrisburg going down there — we had not been out that *Page 495 
forenoon. It had passed Harrisburg. I don't know what time it passed.
"When I got in sight of Allen's switch that morning of the accident, if there had been no train at all in sight I would have been looking for torpedoes until I got closer to the station. I would be looking out for them because they might be left there by some train. When I saw the train and did not see the flagman, then I came to the conclusion I had a clear track and that there were no torpedoes. I saw the train there and saw no flagman and I did not know how long it was there — we had to think of those things very quick on those occasions. The fact that there was no flagman threw me off my guard because there should have been a flagman there when the train was standing there. I know there should have been a flagman there because that is the rule, and the rule exacts it. The flagman always goes out and protects his train."
When on the bridge the pushcar struck one of the torpedoes which exploded and so mutilated one of the legs of Murphy that it became necessary to amputate it, which was done. It is undisputed that when, in pursuance of the rule copied above, torpedoes are placed on the rails, those which are farthest from the train are not taken up when the train leaves.
If the conductor of the freight train had obeyed the rules of the company there would have been a torpedo not less than thirteen telegraph poles from the station in addition to the two that were placed by him at the bridge, and a flagman would have been stationed near the torpedo nearest to the station. The jury would be authorized, under the evidence, to find that if the flagman had been stationed as required by the rule, Murphy would have seen him on approaching the bridge and would have been on the lookout for torpedoes, which he would have discovered and thereby avoided the injury. There being no flagman at the point where the rule required that he should be, the jury under the testimony might find that when Murphy approached the bridge and saw the train standing at the station he looked for the flagman, and seeing none, concluded that no torpedoes had been placed out by that train. The jury could have found under the evidence that Murphy relied upon the fact that no flagman was there and was influenced thereby to proceed in the discharge of his duties without investigating as to the torpedoes, and being thus misled, the car was run upon the torpedo which exploded and Murphy thereby received the injury. This state of facts would justify the conclusion by the jury that the failure of the conductor to place a flagman at the proper point was the proximate cause of the injury to Murphy, and that the railroad company would be liable.
The railroad company having established, by rules promulgated by it, a mode of procedure, under such conditions as existed at the time and place of the accident, Murphy, while discharging his duty, had the right to rely upon the observance of the rules by the trainmen and to act as if the apparent conditions were real, and if Murphy was misled by the negligence of the conductor of the freight train and was thereby injured, the railroad company will be liable. (International G.N. Ry. Co. v. Gray, 65 Tex. 32
[65 Tex. 32]; International G.N. Ry. Co. v. McVey, 12 Texas Ct. Rep., 992; International G.N. Ry. Co. v. Woodward, *Page 496 
63 S.W. Rep., 1051; Galveston, H. S.A. Ry. Co. v. Garteiser, 29 S.W. Rep., 939.)
In the case of Railway Company v. McVey, a section foreman was engaged in unloading a pushcar at a point upon the railroad track near to a railroad crossing of a public highway. The foreman knew that the passenger train was about due to pass over the road, but the blowing of the whistle at the crossing of the public road could be heard where McVey was working, and, relying upon the blowing of the whistle at the crossing, he continued the work, because when the whistle should be blown he could remove the car from the track in time to avoid a collision. The whistle was not blown and the train ran upon the men before they had time to get out of the way, causing McVey's death. This court held that under such circumstances the failure to blow the whistle was negligence on part of the railroad company and that it was the proximate cause of the death of McVey and rendered the company liable, saying: "He knew that the train was due there and would in all probability pass very soon, and he may have relied upon the sound of the whistle at the whistling post to give him warning in time to clear the track."
The Court of Civil Appeals erred in sustaining the action of the trial court in giving the peremptory charge in favor of the defendant. The most favorable phase of the testimony for Murphy would sustain a verdict in his favor. The question of the credibility of the witnesses and the weight to be given to their testimony was for the jury. It is ordered that the judgment of the District Court and that of the Court of Civil Appeals be reversed and the cause remanded.
Reversed and remanded.