## JOS. & SIMON LINZ REALTY CO. v. McDONALD.†

(Court of Civil Appeals of Texas. Dec. 3, 1910. On Rehearing and Additional Conclusions of Fact, Jan. 14, 1911.)

1. MASTER AND SERVANT (§ 246*)—INJURIES TO SERVANT—RESCUE OF FELLOW SERVANT.

In a servant's action for injuries in endeavoring to save a fellow servant's life, it must appear that such fellow servant was in a perilous position through the master's negligence.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 792; Dec. Dig. § 246.*]

2. MASTER AND SERVANT (§ 278*)—INJURIES TO SERVANT — NEGLIGENCE — SUFFICIENCY OF EVIDENCE.

In a servant's action for injuries while attempting to protect a fellow servant, evidence *held* insufficient to show that defendant was negligent respecting such fellow servant.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 278.*]

Appeal from District Court, Dallas County; Kenneth Force, Judge.

Action by W. O. McDonald against the Jos. & Simon Linz Realty Company. Judgment for plaintiff, and defendant appeals. Reversed, and judgment rendered for defendant.

G. D. Hunt, Etheridge & McCormick, and Thomas & Rhea, for appellant. L. R. Calloway and Leake & Henry, for appellee.

BOOKHOUT, J. The appellee, as plaintiff in the court below, filed suit and sought to recover damages from Jos. & Simon Linz Realty Company and the American Well Works, both corporations, for personal injuries alleged by him to have been received on the 27th day of April, 1907. Thereafter, on November 28, 1909, he filed a second amended petition claiming damages against the appellant Jos. & Simon Linz Realty Company, the American Well Works, Simon Linz, Albert Linz, Ben Linz, and Ella B. Linz, executrix of the estate of Jos. Linz, deceased. For cause of action he alleged that on April 27, 1907, he received serious and permanent injuries while employed as a well driller in drilling a well for the defendants; that the defendants were negligent in various respects; that each and all of the defendants had been requested by him prior to his injuries to correct the defects in the machinery, and had promised and agreed to do so; that the plaintiff had relied upon such promise; but that defendants had failed to rectify the defects in the machinery; that a fellow workman was involved, or about to be involved, in a revolving line shaft, and plaintiff was injured in attempting to rescue him, to his damage in the sum of $50,000 and $1,000 for medical expense, medicine, etc., a total sum of $51,000, for which he prayed judgment. The appellant pleaded general demurrer and a number of special exceptions, of which all save one were overruled by the court, and, in addition, pleaded the general

issue, and that appellee and the other employés of appellant were fellow servants, and that appellee assumed the risk of using the machinery, and that appellee was guilty of contributory negligence in that his injuries were the direct and proximate result of an attempt by him to frighten a fellow workman, the fellow workman had by his own negligence placed himself in a place of danger, and further that appellee was guilty of contributory negligence in that he, knowing and observing the dangerous position in which his fellow workman had placed himself, made no effort to warn the fellow workman of his danger or relieve him of the danger until after he became entangled in the line shaft. All of the other defendants adopted the answer of the appellant. Upon trial the appellee dismissed as to defendants Simon Linz, Albert Linz, Ben Linz, and Mrs. Ella B. Linz, executrix. The court instructed a verdict in favor of the American Well Works and submitted the case as to the defendants Jos. & Simon Linz Realty Company. On July 3, 1909, verdict was rendered in favor of plaintiff in the sum of $8,000. The application of the Jos. & Simon Linz Realty Company for a new trial having been overruled, that company prosecutes an appeal.

The evidence shows that appellant, desiring to have a deep well at the back of its building in Dallas, employed one J. E. Bacon, a hydraulic engineer of great experience, to have full charge and control of the work. A derrick such as is commonly used for well drilling was erected; it being about 18 feet square at the bottom and about 64 feet high, slanting to a small square at the top. This derrick was floored over on the sills at the bottom; the flooring covering the entire base of the derrick. The machinery used to drill the well was a rotary rig, which was leased by appellant from the American Well Works, and was a new rig in first-class condition when leased and installed. It consisted of an engine, rotary, drum, cable, and the necessary shaft and chains for the transmission of the power. The engine obtained its steam from the boiler in the basement of the building of appellant. It was connected to the line shaft by drive chains which drove the line shaft when drilling at about 60 revolutions per minute. The line shaft transmitted the power to the rotary by a chain to the drum. The drum was arranged with a clutch so that when the rotary was in motion the drum was not connected with the sprocket over which the drum chain ran, and hence had no motion save and except the slight motion that the cable would give it letting the pipe down as the drill cut the rock, which was at the time appellee was hurt about two inches an hour. This cable ran from around the drum to the top of the derrick and over a pulley there and down to the swivel that held the pipe or casing. It

wound around the drum, which was about ten inches in diameter like a thread on a spool, from end to end, and passed up from the drum about a foot from the line shaft and between the line shaft and the rotary.

Bacon employed R. A. McLeod as day driller on the well and employed appellee as night driller. Bacon had authority to discharge McLeod and appellee. Appellee began work on the well while the derrick was being built, and helped finish the derrick and install the machinery, and was thoroughly familiar with the machinery and all of its parts and the way it was put up. Appellee was a well driller of experience and had used rigs such as this one for many years and was familiar with them. The hole was started in the last of March, 1907; appellee having charge of the night crew as night driller. He had charge of the machinery every night from 7 p. m. to 7 a. m. Some time after the well was started, the appellee assisted McLeod to put an idler pipe across from post to post of the rig. These posts were the ones to which the line shaft and the drum were attached. The idler pipe was a piece of three-fourths inch gas pipe on one end of which was a small sprocket that ran in the drum chain. It was about midway between the drum and the line shaft. It was fastened to the opposite side of the post from the line shaft and was stationary. It was about 18 inches lower and about 12 inches in front of the line shaft. It was used to press down on the drum chain and to keep the drum chain from jumping around on the sprocket on the head of the drum. The chain from the line shaft to the drum was what is known as a No. 103 malleable iron chain. The appellant was caught in the line shaft between the collar holding it to the post and the sprocket wheel that catches the drive chain from the engine. This part of the line shaft was smooth and was in the same condition that line shafts run in the open are usually found. Line shafts are never boxed in or covered on well-drilling rigs. The distance from the collar to the sprocket was about three feet. There was always at all times plenty of light on the rig for the night crew to work by; the derrick being well lighted with electric lights. On the night of the accident to appellee his crew was composed of himself, Richardson, Holmes, and Welch. Appellee had full charge of the crew and rig. Richardson was the derrick man; it being his duty to relieve appellee at the throttle when directed by appellee so to do. The throttle was in three feet of the line shaft and was the place at which the driller stood to operate the rig. Holmes and Welch were floor men, who helped with that pipe, did oiling, and general work of that class. All of them were subject to the control and direction of appellee and did what he directed. About 10 o'clock that night a rain came up, and the rig was stopped, and the men went inside the Linz building. After the rain stopped the appellee and the men went out and started the rig up, and appellee turned the rig over to Richardson and went down into the boiler room of the Linz building for a drink of water. Welch was in the boiler room with appellee. Holmes and Richardson were out on the rig. Immediately after appellee went off of the rig, Holmes seated himself on the idler pipe with his feet on the drum and was leaning forward with his elbows on his knees and his shoulders some distance from the line shaft, which was behind him and revolving about 60 revolutions per minute over towards him. The machinery was all in good condition.

Plaintiff further testified: "Holmes was sitting on the idler shaft about three or four feet from the northwest leg of the derrick. When I came out of the boiler room he was sitting there, and the next time I saw him he was on the line shaft. His feet were on the drum, and he was kinder leaning forward when I came out. The machinery was drilling at the time, and Mr. Richardson was operating it. You could just tell that the drum was moving. I don't know how fast the line shaft was moving. It was going fast enough to make the rotary run about 28 revolutions per minute. I don't know of any danger that is added to the operation of a rig by reason of an idler shaft being on it as it was on this rig. Richardson was sitting on a stool right between the sprocket wheel on the edge of the drum or the clutch on the edge of the drum with his hands on the brake lever, and he was facing me, and Holmes was sitting on the idler shaft with his feet on the drum. There were no keys or slots or holes in that line shaft. It was just an ordinary smooth line shaft and the same kind of a line shaft that is used on all well-drilling rigs. The line shaft is never built in with a frame around it or covered up. It is always open and runs across from post to post, just as it did on this rig. The only difference between this line shaft and the usual line shaft on well rigs is that it had more sprockets than the usual line shaft. The malleable iron chain did not increase the danger of anything around that rig. Holmes was not doing anything that I know of, sitting on that pipe. I saw him sitting there when I came out of the boiler house and went under the exhaust pipe. I never sat on that idler shaft, and that is the first time I had ever seen any one sitting on it. I could not tell whether any of Holmes' clothes were caught in the line shaft or not. He was sitting on the idler pipe when I first saw him, and it was something like two or three minutes from the time I saw him sitting there until I hears some one halloo. I had not told him to get off of the idler pipe. It was not put there as a seat. I did not think there was any danger in him sitting there. If he had not been sitting there, I would not have got-

ten hurt. It was part of my duty to look after the machinery and see that it was all right."

As to how the injury occurred, plaintiff testified as follows: "When the rain was over, I told Richardson and Holmes to go out there and start up, and in two or three minutes I went out of the boiler house and stooped down and went under the exhaust pipe from the engine and pump and stooped all the way down until I got under the chain and had to get down on my knees to drive a key up. About the time I drove this key up, Holmes hallooed to shut the engine down. He was right over me, and when he hallooed I just took hold of him and pushed him off of there, and when I went to push him off his coat caught my hand. He was pulling down. He was going this way, and after I got caught I hallooed at Richardson to shut the engine down and threw this leg up over the line shaft so that I could ride around with it, and when I got to this piece of pipe (idler pipe) it stopped me, and the first time I went between the line shaft and this piece of pipe. * * * Richardson had reversed the engine, and I rolled around back off of the line shaft and was standing on the ground with this arm over the line shaft, and by that time Welch had run out of the boiler house and unwrapped the part of Holmes' coat that was caught on my arm, and I reached under there to take it up, and he says 'Hold a minute, I will lift it up,' and he lifted it over there for me." Witness was shown the picture attached to statement of facts marked "No. 1," and testified: "This picture represents the back side of the machinery. The pipe running about the man's shoulder is the idler pipe. It did not have any business on that machinery at all. It stands out about six inches; the line shaft is on the inside, and the idler pipe is on the outside. The post is six inches wide, and would make it stand out six inches. There is a 'U' bolt screwed on this post, and the pipe is put in the 'U' bolt. A man could sit on the idler pipe and not touch the line shaft at all. I think Holmes was sitting that way when I first saw him. The line shaft was moving around toward Holmes, and he had got caught in it when I pushed him. I went around the line shaft one time and halfway around another time. I got past the idler pipe the first time because I was lengthwise with the shaft. The second time it had rolled my hand and arm up until it got me up to my side, and it brought me over just like I was sitting around in this chair. It brought me over this way because my feet and legs and the rest of my body was hanging down by the line shaft, and I could not pass through there."

Appellee was an experienced well driller at the time of the injury and had had 12 or 15 years' experience drilling wells. Had worked on about 200 wells. He testified that: "The rig used on this well was a rotary rig, and the rigs I had been using were rotary rigs on the other wells drilled by me. All these rigs had been rigged up with a line shaft for the purpose of transmitting power from the engine to the rotary and to the drum."

Two photographs showing the line shaft, idler, and the malleable chain were in evidence before the jury.

As to the request made to repair, the appellee testified on direct examination as follows: "I asked Mr. McLeod to put a chain on there, and if he did not I was going to quit and would not work. He said he would see about getting one; that he would see Bacon. I also told Bacon that night to put a chain on there, and he said he would just as soon as he could get one from the supply house. On the night I got hurt, Mr. Bacon and I were sitting under a shelter there during the rain, and I asked Mr. Bacon why he did not put that chain on there. He said he would do it in the morning. I believed he would put it on there and went to work and stayed at work."

It is contended by appellant, under assignments properly embracing the contention, that the undisputed evidence shows that the appellee received his injuries, in contemplation of law, as the result of an accident, because the injuries could not have been contemplated by the defendant or any of its officers and agents as liable to ensue from any of the alleged acts of negligence.

The question presented by the proposition is: Could the appellant, its officers or agents, have reasonably anticipated, under ordinary circumstances, that the appellee as the natural and probable result of operating the machinery would sustain the injuries or some such injuries as those received by him? If the injuries to appellee could not have been reasonably anticipated by appellant, then they were in law the result of an accident for which appellant is not liable. Seale v. Railway Co., 65 Tex. 274, 57 Am. Rep. 602; Railway Co. v. Bigham, 90 Tex. 223, 38 S. W. 162.

The complaint made to Bacon and McLeod by appellee had reference to the malleable iron chain extending from the line shaft to the drum; appellee insisting that this should be a steel pin chain, which was heavier and would not jump the sprocket. Bacon and McLeod had promised appellee to make this change in the morning. Appellee testified, in effect, that had this change been made the idler pipe would have been unnecessary. In our opinion it cannot be said that the fact that the machinery was equipped with an idler pipe under the facts constituted actionable negligence. It was not the proximate cause of appellee's injuries. His injuries resulted from his attempt to push Holmes, his fellow workman, off the idler pipe, and while so doing his hand was rolled up around the line shaft with Holmes' coat,

which had caught thereon. The evidence fails to show that any witness had ever heard of any one becoming involved in a line shaft on a well-drilling rig. None of them had ever heard of any person attempting to ride a line shaft. Some of them had operated rigs of the same kind for 25 years and in many different states. The appellee had no idea of any other danger from the idler shaft than that it might pull off and hit some one. In our opinion it could not have been anticipated by the officers or agents of appellant that Holmes would take a seat upon the idler pipe in front of a rapidly revolving line shaft, and that his coat would become involved in the shaft and appellant would be injured in attempting his rescue. While his act in attempting the rescue of his fellow workman was commendable, and while appellee sustained serious and permanent injuries, yet we are of the opinion his injuries could not have reasonably been anticipated by appellant, its officers or agents. Railway Co. v. Bigham, supra; Seale v. Railway Co., supra; Brush Electric Light Co. v. Lefevre, 93 Tex. 607, 57 S. W. 640, 49 L. R. A. 771, 77 Am. St. Rep. 898; Railway Co. v. Welch, 100 Tex. 121, 94 S. W. 333; Prokop v. Railway Co., 34 Tex. Civ. App. 520, 79 S. W. 101; Railway Co. v. Reiden, 48 Tex. Civ. App. 401, 107 S. W. 667; Duerler Mfg. Co. v. Dullnig, 83 S. W. 890; Id. (Sup.) 87 S. W. 333. Holmes was not sitting on the idler pipe by reason of any act of negligence of the appellant. He was not at the time in the performance of any duty he owed appellant.

The fact that appellant maintained an idler pipe on the rotary rig could not, under the circumstances, have constituted negligence as to Holmes. As testified to by appellee, it had a duty to perform; its purpose being to hold the chain back in its place and take up the slack in the chain and make the chain ride the sprocket. He further testified that he does not know what Holmes got upon the idler pipe for. "He was not doing anything when I saw him." He also testified that: "He did not consider there was any danger in his sitting there. He did not tell him to get off. It was not put there as a seat." Holmes was sitting on the idler pipe, with his feet on the drum and his back to the line shaft, looking down, when appellee attempted his rescue. The law is that, in an action by a servant to recover on account of injuries sustained in an effort to save the life of a fellow servant, the person whose rescue is attempted must be in a position of peril from the negligence of the defendant. In the case of Donahoe v. Railway Co., 83 Mo. 560, 53 Am. Rep. 594, the law is stated thus: "If the railroad company is not chargeable with negligence with respect to the person in danger, the case of the person who attempted to rescue him and was injured must be determined with reference to the negligence of the company in its conduct toward him and his in making the attempt. In other words, the negligence of the company, as to the person in danger, is imputed to the company with respect to him who attempts the rescue, and, if not guilty of negligence as to such person, then it is only liable for negligence occurring with regard to the rescuer, after his efforts to rescue the person in danger commenced." See, also, Railway Co. v. Hiatt, 17 Ind. 102; Railway Co. v. Ridley, 114 Tenn. 727, 86 S. W. 606; Railway Co. v. Lynch, 69 Ohio St. 123, 68 N. E. 703, 63 L. R. A. 504, 100 Am. St. Rep. 658. In the case last cited it was held by the Supreme Court of Ohio that the conditions upon which there may be a recovery on account of injuries sustained in an effort to save human life are that the person whose rescue is attempted must be in a position of peril from the negligence of the defendant. If Holmes was in a position of peril at the time appellee attempted to push him from the idler pipe, it cannot be said his peril was the result of the negligence of appellant.

Under the facts we are of the opinion the court erred in refusing the charge requested by appellant instructing a verdict for defendant.

The judgment is reversed, and judgment here rendered for appellant.

## On Rehearing and Additional Conclusions of Fact.

Appellee has filed a motion for rehearing and a request for additional conclusions of fact in this cause, and in accordance with such request we make the following additional findings of fact, to wit:

There was testimony tending to show that the line shaft at the time of the injury to appellee was rusty, and the verdict of the jury embraces a finding that it was rusty, and in deference to the verdict we so find. We further find that there was no platform back of the drum upon which to stand.

Appellee took orders from both Bacon and McLeod.

Holmes was about to be caught by the line shaft when appellee pushed him off the idler pipe.

These additional findings do not change the result reached in the opinion. The fact that there was rust on the line shaft, and that there was no platform back of the drum upon which to stand, did not constitute negligence on the part of the appellant as to Holmes.

As stated in the opinion, the appellant not being negligent as to Holmes, the person sought to be rescued, the appellee was not entitled to recover.

Appellee's motion for rehearing is overruled, and his request for additional conclusions is granted in part, as above set out.