TEXAS TRACTION CO. v. BOGUE.

(Court of Civil Appeals of Texas. Dallas.
July 1, 1911. Rehearing Denied -
Oct. 7, 1911.)

1. STREET RAILROADS (§ 88*)—OPERATION BY
DIFFERENT COMPANIES — COLLISION — CON-
TRIBUTORY NEGLIGENCE.

Where a street railway motorman operated
his car at night at a high rate of speed in vio-
lation of the rules of his company, when he
knew that a car operated by another company
on the same track had turned out of a cross-
street onto the track ahead of him, and came
into collision with such car as it had slowed
down to pass another car going in the oppo-
site direction, plaintiff was negligent as a mat-
ter of law, which precluded a recovery for his
injuries sustained, against the owner of the car
with which plaintiff collided.

[Ed. Note.—For other cases, see Street Rail-
roads, Dec. Dig. § 88.*]

2. STREET RAILROADS (§ 98*)—COLLISION—IN-
JURIES—RULES—APPLICATION.

Where a street railway motorman was in-
jured by operating his own car in violation of
the rules of his employer causing a collision
with a car of another company operated in the
same direction in front of plaintiff's car at
night, the other company could plead plaintiff's
contributory negligence in violating the rules
of his own company as constituting contribu-
tory negligence; the observance of such rules
being essential to the safe operation of the
cars of both companies over the same line.

[Ed. Note.—For other cases, see Street Rail-
roads, Cent. Dig. § 204½; Dec. Dig. § 98.*]

Appeal from District Court, Dallas Coun-
ty; E. B. Muse, Judge.

Action by E. L. Bogue against the Texas
Traction Company. Judgment for plaintiff,
and defendant appeals. Reversed and ren-
dered.

M. B. Templeton and T. B. Williams, for
appellant. Ed Sewell and Carden, Starling,
Carden & Hemphill, for appellee.

RAINEY, C. J. This is a suit by appellee
to recover of the Texas Traction Company
damages for personal injuries received by
him by reason of the car operated by him on
the Metropolitan Street Railway running
into the rear end of a car operated by the
traction company on the said street railway
track. Appellant pleaded the general issue,
assumed risk, and contributory negligence.
A trial resulted in a verdict and judgment
for appellee, and appellant prosecutes this
appeal.

The first assignment of error complains of
the court for refusing to submit to the jury
a special instruction as follows: "You are
instructed in this case to return a verdict
for the Texas Traction Company."

[1] The facts show that Bogue was an em-
ployé of the Metropolitan Street Railway
Company in the city of Dallas, and at the
time of the accident was operating one of
its cars as motorman. The Texas Traction
Company operated an interurban line from
Dallas to Sherman, and in the city of Dal-
las its cars run over the track of the Metro-
politan Street Railway Company. The street
railway company has double tracks extend-
ing north and south (general direction) across
East Dallas along Peak street, a distance
of probably a mile or more. These tracks
cross at right angles streets of the city, a
distance from one another of 300 to 400 feet,
at which crossings arc lights are swung by
the city in the usual way. The city cars are
called "North Belt cars," and go the full
length of Peak street, crossing Bryan. The
interurban cars leaving the city pass out over
Peak street to Bryan, then turn at right
angles going into Bryan street and in a
northeast direction out of the city; the in-
coming cars enter the city over the same
line. The accident occurred at 11:45 o'clock
at night. The incoming interurban car turn-
ed out of Bryan street into Peak street ahead
of the city car. As the turn was made, the
city car was some 400 or 500 feet north on
Peak street. Bogue, the motorman, saw the
interurban as it swung around the corner
at Bryan and passed over the switch to the
right-hand track, coming in. By that time
*Bogue had approached still nearer the car.
He could see the interurban because its
side was turned towards him and the inside
was brilliantly lighted with electric lights.
Bogue discovered at that time that there
were no lights upon the rear end of the in-
terurban car. The collision occurred at
Swiss avenue crossing, being the second cross-
ing south of Bryan. The surface is level
from Bryan to Swiss, rising just a little.
The incoming interurban had stopped on the
south side of Swiss avenue about the same
time the outgoing interurban came up along-
side of the incoming car and stopped, or al-
most stopped. At this time the city car
approached Swiss avenue from the north.

Appellee testified:

"There were no red lights on the rear end
of the incoming interurban car. I discovered
that just after I hit it, and before he tak-
en the crossover on Bryan street I did not
see any red lights on the rear end of it. The
first time I discovered there were no red
lights on it was after it had turned into Peak
street. After it passed I did not think very
much about it. I knew it would pull right
off and leave me like they always do. I did
not think anything about running behind a
car that had no red lights on it. I was not
dreaming of any such thing as running be-
hind that car; did not know anything about
it; never had thought of it. I was not ex-
pecting to run into it. When I first saw it
I never thought much about it, only I thought
it did not have any markers on the back of
the car. I have seen them several times
since. I don't know that I ever noticed it
before. I know that at that time they did
not often carry them, but did not know it at
that time. I also knew that a bright light

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key No. Series & Rep'r Indexes

was shining in my face. I think that if you were going south and following another car going south, and there is a car on the other track going north, there would be a time when the car in front going south would prevent you from seeing the car going north on the other track. I was running something like six or seven miles an hour when I got to the north edge of Swiss avenue, and the south-bound interurban car something like six or seven feet, something like that, below Swiss avenue. The north-bound interurban car was just sticking over a little bit into Swiss avenue, or about even with Swiss avenue, or something like that. When I came up to Swiss avenue and going into Swiss avenue, I think I was going about six or seven miles an hour. When I got to the south edge of Swiss avenue, I was making about three miles an hour; not over three miles an hour. I had to pass the headlight of the north-bound Texas Traction Company car before I saw the south-bound Texas Traction Company car, which would put me around about the south side of Swiss avenue when I discovered the south-bound Texas Traction Company car. The reason I did not see it sooner is because the headlight on the north-bound traction company car was so bright it blinded me and I could not see it. The headlight of the north-bound Texas Traction Company car, which was on the opposite track from the track I was on, was so bright it blinded me. That headlight was very bright, in full blast. They usually use a screen of white cloth over the headlight to make it dim. They do that to screen the headlight so it would not burn so bright; it is to blind it. I have seen those screens of cloth used on this Ft. Worth interurban—the Northern Texas Traction Company—and then they have used that on these Sherman interurbans since. The Texas Traction Company have used them since I had the accident. They either used the screen, or when they come out Peak street here they cut their lights out very nearly. * * *

"There is a rule in the rule book of the Dallas Street Railway Company about the speed of cars passing cars that are standing still. * * * The rule is that when one car is standing still, and you are approaching with another car, the speed is three miles an hour, and over switches the same way. You are supposed to go over switches at three miles an hour when an inspector is around. I don't know how fast a motorman ought to run; I did not know when I was in the service. All I cared was to make the schedule time that was given. I was due at the loop on Market street that night at 12 o'clock. I had only 15 minutes to run from Bryan street to town. I don't know how far that is, but suppose it is over two miles. The rule in regard to spacing between cars while in motion is 300 feet, and at rest 25 feet. * * * When the interurban car turned off of Bryan street into Peak

street, I guess I was about three blocks north of it, something like that; I suppose it would be about 600 feet. That would throw the north side of the interurban car towards me as it took the crossing off of Bryan into Peak street. While operating a street car, the motorman is supposed to stand in the center of the car in the front end, in order to operate both his brake and controller. They are located right there; one on one side and the other on the other side. The rule respecting attention and observation in respect to the track in front is to look ahead of you continually while the car is in motion. I understood that at the time. I saw the interurban car ahead turn in on Bryan and Peak street. * * * When I pulled out from Bryan street south, I don't know how far ahead of me the interurban car was. * * * I knew about the time I got to Swiss avenue that the north-bound interurban car was standing still. I saw the light before that, but you can't tell whether they are moving or not. I did not know it was standing until I got up to about the edge of Swiss avenue, as well as I remember. My judgment is I was something like the north edge of Swiss avenue when I discovered the north-bound interurban car ahead stopped. It was on the south side, with the body of the car down Peak. * * * Having discovered it, it did not occur to me that it had stopped in order to let another car pass. I thought it had stopped there because about a month before this there was a Sherman interurban car hit a wagon there on Swiss avenue. The first thing struck me was it was something like that. I never thought of this other car. * * * If it had not been for that thought about the wagon, I would have stopped anyway, because after I saw the car had stopped I would have to roll on down just like I had to pass a car, just like I always pass a car standing still. I never thought about the fact that the motorman on the interurban car ahead of me would have to stop his car on account of that regulation and that he might be standing there in the dark.

"There were lights on the inside of the car ahead of me. There are lights in all cars. I saw them through the glass door. I saw the lights as the car passed Bryan street at the crossover there. * * * I would not swear that it is an electric light; I do not know a thing in the world about the headlight on one of these interurban cars. The lights on our cars are just like the lights here in the courtroom, 16 and 32 candle power. We had a light on the rear end of our car, but not a red light. It was not our order to have red lights on the rear of the car. I don't know that the city ordinances require that. * * * For stopping the car, my car was equipped with a hand brake and a reverse lever. The reverse lever is attached to the controller of the car at the front end, and it has three notches on it;

one locks the controller, and the notch ahead feeds the controller when you put the juice, or current, to it. The hand brake is used to stop the car. We do not use both the hand brake and the reverse to stop the car. The reverse lever is used only in emergencies. The stopping power comes from the brake operating against the wheel. When you jerk the reverse lever, that turns the wheels in the opposite direction. To reverse a car you pull the lever and feed the controller; that is, feed the current into the reverse machine of the car. You can use both hands and do that all at once. The car was in good condition, except a little tight with the brakes kicking. A kicking brake is one that is not adjusted right and jerks a little. I was pretty well qualified to perform my duties and thought I understood what they were. I familiarized myself with the rules and regulations; had them furnished me by my superiors in the service and studied them while I was breaking into the business. Of course, I understood that I was expected to obey the rules and regulations. I knew that in passing over Peak street we passed the interurban cars now and then. There are two tracks out on Peak street, and all cars going north go on the right-hand track. Peak street is double tracked to where Washington avenue car line runs. Going north the cars are on the right-hand side and coming south it is the same way. As the cars pass there is a space I guess of two or three inches between them. There is no rule about speed in regard to passing cars while they are in motion. There is a rule in the rule book of the Dallas Street Railway Company about the speed of cars passing cars that are standing still. I haven't the book with me. We are not allowed to keep it after we quit. The rule is that when one car is standing still, and you are approaching with another car, the speed is three miles an hour, and over switches the same way. * * * I don't know of any rule of the interurban company that when one interurban meets another it has to come to a stop, and there is no reason that I know of for the north-bound car to stop when it met the south-bound. I never had any order to put any lights or signals on the rear end of my car. Our instructions are to keep our headlights cut out on the rear end of our cars. The interurban cars put signals on the back end of their cars because they are easily seen, and that is why they use red lights instead of white lights. I don't know whether they had been running with red lights back there in the rear before I was hurt or not. When you are meeting one of these interurban cars with a bright headlight burning, you are not able to tell whether the car is moving or not until you get pretty close to it."

Bogue made a signed written statement to his company within a few hours after the accident. He said: "When I first saw the car, I was only 15 or 20 feet away from it. It was standing, and I was running about 10 or 12 miles an hour when I first saw it. The Texas Traction cars had met there and had stopped. The one going north had the headlight burning very bright and blinded me so I could not see the other one. There was no red light on the rear end of the south-bound Sherman car. There were no lights of any kind. They were about a car length south of Swiss avenue. When I first saw the Sherman car, I set up my brakes and reversed and blew the overhead. Then I ran into the Sherman car. The front end of my car was crushed in, and the top of the controller was turned loose, but never fell. I had my foot under the bottom of the controller, and I think when the top was turned loose it fell back and caught my toe under the edge of it is what hurt my foot. I was knocked down, but fell down against the end of the car. I could see the headlight on the north-bound car from the time I crossed Bryan street until I struck the south-bound car. I have had no orders about passing Sherman cars. I had several passengers on my car, and none of them were hurt. I am not hurt anywhere except my foot. Dr. Doolittle saw my foot. He said there were no broken bones. My car was not in good condition. The brakes were bad. I had not reported them. I had had the car since 5:30 p. m. I do not hardly know what was the matter with them, except that they were what we call a kicking brake. I do not know how they were at this particular time. I had to commence trying to stop a good piece back from where I wanted to stop on account of the condition of the brakes."

One of the printed rules of the street car company reads as follows: "When passing cars that are at a standstill on opposite tracks; cars that are about to stop, or when passing cars in any part of the city where the street traffic is heavy, or pedestrians or vehicles are nearby, the car must be slowed down to a speed not exceeding three miles per hour, and must be under absolute control so that instant stop is possible." Another rule: "Cars must be under control crossing intersecting streets. Cars running in opposite directions must not cross intersecting streets, steam or electric railway tracks at the same time. The car reaching the street, steam or electric railway tracks first will have the right of way and the other car must wait until the first car has passed over."

The evidence was conflicting with reference to the interurban car having a light on its rear end at the time of the collision, and it was sufficient to support the jury's finding that there was none. It also shows that appellee was injured by the collision. Plaintiff offered in evidence an ordinance under date 1877, of the city of Dallas (chapter 4), entitled: "Rules governing the operation

of street railways; street railways subject to the conditions of this chapter." It was provided that the rules and regulations concerning the running and operation of street railway cars shall be binding upon every person, firm, or corporation operating a street railway within or leading into the city. Section 8: "The cars after sunset shall be provided with signal lights." It is shown that in 1908 Texas Traction Company owned and operated an interurban railway from Sherman to Dallas, having tracks, right of way, depots, etc., and running into the city over the lines of the city street railway by virtue of an ordinance of the city granting the right and permission to operate its cars over the track of certain railway companies, and that said ordinance was granted subject to the existing charter and ordinances of the city of Dallas and such future charter and ordinances as may hereafter be passed, etc. It was also shown by the city charter adopted in 1907 (Sp. Laws 1907, c. 71, art. 2, § 8), that interurban railways are therein defined to be, within the meaning of the charter, "railways operating their cars by electricity for the carriage of freight and passengers for hire, not wholly within the city and its suburbs, but as lines extending from the city to Dallas and its suburbs to other towns, cities or villages." "That the board of commissioners shall have power, subject to the terms and conditions contained in this charter, to grant to a person or corporation desiring to extend an interurban railway into the city, the right to lay tracks and operate cars over the streets or other property of the city and over the tracks of other street railways for a term not exceeding twenty years." Also: "The right mentioned in the preceding section shall be granted by ordinance only, which shall not be finally passed until after three separate readings, etc. * * * The ordinance granting such right or franchise shall contain such conditions as may seem proper to the board of commissioners, and shall provide for such reasonable compensation to the city as may seem just," etc. It is then provided: "The terms of this charter concerning the granting of franchises to persons or corporations for the purpose of rendering any public service wholly within the city of Dallas and its suburbs, shall not apply to interurban railways, except as specified in the four preceding sections and in the various sections providing for the referendum." The city ordinance provided that: "Cars driven in the same direction shall not approach each other within a distance of 300 feet, except in case of accident." Ordinance also provided: "It shall be unlawful for any person to propel, drive or move any street car at any place in the city of Dallas at a greater rate of speed than 12 miles per hour." It is also provided by city ordinance that 12 consecutive hours shall be the limit to keep conductors, motormen, etc., on the cars. Also, a rule of the company, that, in passing cars at a standstill on opposite tracks, the speed in no event to exceed three miles per hour and must be under absolute control so that instant stop is possible; also, at street crossings make full stop on opposite side of street to let the car upon the opposite side, reaching it first, pass over, etc.

We think the evidence shows conclusively that appellee was guilty of contributory negligence, and that the court erred in not instructing a verdict for the appellant. The appellee violated the positive rules of the street railway company, which were well known to him, and but for their violation he would not have been hurt. He approached and entered Swiss avenue at a greater rate of speed than was permissible under the rule prescribed by his company, which requires that when passing cars on opposite tracks, or cars about to stop, the speed must not exceed three miles per hour and must be under absolute control, so that instant stop is possible. Also, "cars must be under absolute control crossing intersecting streets." "Cars running in opposite directions must not cross intersecting streets * * * at the same time. The car reaching the street * * * first will have the right of way and the other car must wait until the first car has passed over." Appellee, when he entered Swiss avenue, was driving his car at the speed of 6 or 7 miles per hour according to his testimony on the trial; but in a statement just after the collision he stated 12 or 15 miles an hour, though he stated on the stand that at the time of the collision he had slowed down to about 3 miles an hour. This shows an utter disregard of the rule relative to the speed under the conditions then existing.

He was guilty of a more flagrant violation of the other rules relating to the passing of cars at the intersection of streets. He saw the outgoing interurban car approaching on the opposite track. He evidently knew that it had reached the street first and had stopped. Notwithstanding, he entered Swiss avenue under full headway and caused the collision. If he had observed either rule, the existence of which he was perfectly cognizant, he would not have been injured. Again, he not only violated the rules of the company, but knowing the interurban car was ahead of him, and thinking that probably the interurban car had struck a wagon, he plunged his car into utter darkness, regardless of consequences, which to our minds shows a lack of care for his own safety that constitutes negligence and prevents a recovery.

The appellee contends that the violation of a rule cannot be said as a matter of law to be negligence, but that it is a question for the jury, and that the question was submitted to the jury, which settles the matter.

While, under some circumstances, whether the violation of rules constitutes negligence

is a question for the jury, yet we are of the opinion that the facts in this case show conclusively that appellee was guilty of negligence. The principles applicable to this case are announced in Railway Co. v. Brice, 100 Tex. 203, 97 S. W. 461, where the court, in effect, holds that failure to observe a plain rule is negligence and prevents a recovery by the party so guilty. Railway Co. v. Brice, 111 S. W. 1095; Railway Co. v. Reiden, 48 Tex. Civ. App. 401, 107 S. W. 661; Brick Co. v. Baird, 128 S. W. 462.

[2] Appellee, in effect, contends that the rules of the street railway company were made for the operation of its own cars, and, as the appellee was not in the service of appellant, it cannot be relieved from liability by the negligence of appellee. We do not concur in this view. The appellant had the right to run its cars over the line of the street railway company, and the observance of said rules was necessary in operating its cars with relation to the operation of appellant's cars, and appellant had the right to depend upon a proper observance thereof, and entitled to interpose the negligence of appellee as a defense to appellee's cause of action.

As the evidence shows no cause of action, but, on the other hand, shows conclusively that appellee was guilty of contributory negligence, the cause is reversed, and judgment here rendered for appellant.

Reversed and rendered.